UNITED STATES of America, Plaintiff,

Donny Brurell Buckley, Alycia Marquese Buckley, By their parent and next friend, Ruby L. Buckley, on behalf of themselves and all Negro school age children residing in the area served by original defendants herein, Intervening Plaintiffs,

Indiana State Teachers Association, Intervening Plaintiff,

v.

The BOARD OF SCHOOL COMMISSION-ERS OF the CITY OF INDIANAPOLIS, INDIANA; Karl R. Kalp, as Superintendent of Schools; Patricia Welch, as President of The Board of School Commissioners; Mary E. Busch, Lillian M. Davis, Robert D. DeFrantz, Walter Knorr, Donald G. Larson, James R. Riggs, Members of The Board of School Commissioners of the City of Indianapolis, Defendants,

Otis R. Bowen, as Governor of the State of Indiana; Theodore L. Sendak, as Attorney General of the State of Indiana; Harold H. Negley, as Superintendent of Public Instruction of the State of Indiana; The Metropolitan School District of Decatur Township, Marion County, Indiana; The Franklin Township Community School Corporation, Marion County, Indiana; The Metropolitan School District of Lawrence Township, Marion County, Indiana; The Metropolitan School District of Perry Township, Marion County, Indiana; The Metropolitan School District of Pike Township, Marion County, Indiana; The Metropolitan School District of Warren Township, Marion County, Indiana; The Metropolitan School District of Washington Township, Marion County, Indiana; The Metropolitan School District of Wayne Township, Marion County, Indiana; School City of Beech Grove, Marion County, Indiana; School Town of Speedway, Marion County, Indiana; The Metropolitan Development Commission of Marion County; The Housing Authority of the City of Indianapolis; The Indiana State Board of Education, a public corporate body; Added Defendants,

Citizens for Quality Schools, Inc.; Intervening Defendant,

Coalition For Integrated Education; Amicus Curiae.

The BOARD OF SCHOOL COMMISSIONERS OF the CITY OF INDIANAPOLIS, INDIANA, Cross-Claimants,

v.

The METROPOLITAN DEVELOPMENT COMMISSION OF MARION COUNTY, The Housing Authority of the City of Indianapolis, Cross-Defendants.

No. IP 68–C–225.

United States District Court, S. D. Indiana, Indianapolis Division.

April 24, 1979.

Judgment July 9, 1979.

Alexander Ross, Samuel Flanagan, Dept. of Justice, Washington, D. C., for plaintiff.

John O. Moss, John Preston Ward, Richard J. Darko, Indianapolis, Ind., for intervening plaintiffs.

John Wood, Theodore L. Sendak, Atty. Gen., Donald P. Bogard, Charles W. Hunter, Indianapolis, Ind., William O. Schreckengast, Beech Grove, Ind., Lewis C. Bose, William M. Evans, Donald A. Schabel, H. William Irwin, Ben J. Weaver, Charles G. Reeder, Richard L. Brown, Richard D. Wagner, William F. LeMond, Kurt F. Pantzer, Jr., Sheila Suess, Indianapolis, Ind., for defendants.

Harold E. Hutson, Indianapolis, Ind., for intervening defendant.

William E. Marsh, Indianapolis, Ind., for amicus curiae.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

### I

This continuing action, filed May 31, 1968, is before the Court on its second 1978 remand from the Court of Appeals for the Seventh Circuit.

By the first remand, 573 F.2d 400 (7 Cir. 1978), this Court was directed to determine whether or not certain acts passed by the General Assembly of Indiana in 1969 were enacted with a racially discriminatory intent or purpose. This Court was further directed to determine whether or not the action of the added defendant Housing Au-

thority of the City of Indianapolis (HACI), as approved by the Metropolitan Development Commission of Marion County (MDC), in locating all of its public housing projects within the territory of the defendant Board of School Commissioners of the City of Indianapolis (IPS) was done with a racially discriminatory intent or purpose. If the answer to either of the foregoing was in the affirmative, this Court was further directed to consider the principles of *Dayton v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), in providing an interdistrict remedy.

This Court complied with the foregoing mandate by its Memorandum of Decision dated July 11, 1978, 456 F.Supp. 183, answering both questions in the affirmative, and estimating that some 7,000 black pupils might well have been afforded a desegregated education in suburban schools had the public housing units been located outside IPS. The Court then entered a judgment which ordered IPS to transfer, and certain added defendant school corporations within Marion County to receive, certain numbers of black pupils; other orders were entered as to other added defendant.

All defendants and added defendants appealed, but the Court of Appeals deferred consideration of the appeals and again remanded the action on motion of the defendant IPS "for the limited purpose of hearing and deciding upon modifications of the July 11 judgment in the nature of alternative remedy, plans and related evidence proffered by IPS (as well as any alternatives, objections, modifications, and rebuttal of any opposing parties) and hearing and making additional findings upon further evidence offered by any parties on the issue of which alternative remedy (including pupil reassignment, ancillary relief, and allocation of desegregation costs) is necessary and equitable to overcome the combined effect of all the constitutional violations previously found by the district court."

As stated, the limited remand was granted on motion of the defendant IPS, which came forward with an elaborate interdistrict desegregation plan (Plan C), prepared under the supervision of Gordon Foster, Ph.D., a professor in the School of Education at the University of Miami (Florida). This plan would mandate the exchange of some 52,000 pupils between IPS and the ten other school corporations in Marion County, requiring the busing of approximately 41,000 students. Each school in the county would end up with a student body approximately 27% black—the current percentage of black pupils in the county as a whole.

IPS also submitted Plan A, as required by the Court, which plan would implement this Court's previous order of July 11, 1978 directing the transfer of black IPS pupils to eight suburban school corporations in Marion County by identifying in Part I thereof geographic areas from which such pupils would be selected. Part II of such Plan A provides a plan for the final desegregation of IPS within its own boundaries following the implementation of Part I. IPS furthermore submitted Plan B, which would require the transfer from suburban schools to IPS of white students equal in numbers to those black students transferred to the suburbs under Plan A. The preference of IPS is for the adoption of its Plan C. (Although all of Marion County, except certain cities and towns, is now a part of the City of Indianapolis under Uni-Gov, this memorandum will sometimes refer to the added defendant school corporations as "suburban schools.")

Pursuant to that part of the limited order of remand which permitted any party to submit an alternative plan of desegregation, the Metropolitan School Districts of Lawrence, Warren and Wayne Townships of Marion County (hereafter LWW) also submitted a partial plan of desegregation. By such plan, Warren and Wayne offer to accept the transfer from IPS of specified territory containing black students sufficient to raise the percentage of such students in their respective school systems to 7.5%. Such territory would be disannexed by IPS and annexed by Warren and Wayne, respectively, so as to become a part of their respective systems for all school purposes, including taxation and the right of voters

residing in the annexed territories to vote in school board elections in the townships. They would also agree, along with the Metropolitan School District of Lawrence Township, to accept voluntary transfers of black pupils from IPS, and to permit voluntary transfers of their own white pupils into IPS. The Metropolitan School Districts of Decatur, Pike, and Washington Townships, and the Franklin Township Community School Corporation later joined in the LWW plan to the extent of agreeing to the transfer policy, with Pike and Washington likewise agreeing to annex a limited amount of IPS territory containing black students.

The United States of America, the original plaintiff herein, did not present a plan. However, in its posthearing memorandum, filed March 21, 1979, it suggested that the most appropriate remedy would be to require IPS to devise a plan to annex all or portions of the Marion County suburban school systems leaving the extent of suburban involvement to IPS, in the first instance. Any annexation by IPS, the Government observes, would be subject under Indiana law to the right of residents of the annexed areas to file a remonstrance action in state court. If such remonstrance be filed, the Government next suggests that "the propriety of such remonstrance action could be properly judged by this Court from the standpoint of whether the remonstrance interferes with the court-ordered desegregation plan. See *United States v. State of Texas*, 356 F.Supp. 469 (E.D.Texas, 1972)."

The intervening plaintiffs Buckley, representing the class consisting of all Negro children of school age attending segregated schools in IPS, took a position in favor of Plan A, and adduced evidence in support thereof.

The intervening plaintiff Indiana State Teachers Association did not present a plan for desegregation of the IPS schools. Such plaintiff did, however, make a number of suggestions relative to ancillary relief, and as to the relief of teachers who might be rendered surplus as the result of a desegregation order.

A hearing was had November 6—November 21, 1978 to take additional evidence on the foregoing matters. The parties were granted permission to file posthearing briefs, the last of which was filed March 21, 1979. An unusual feature of this most recent hearing was the role reversal on the part of the original defendant IPS. From the inception of the action, IPS has resisted efforts to desegregate its schools, including orders to transfer some of its pupils to suburban schools. Now, however, IPS demands that it be ordered to exchange its pupils with those of each of the suburban school districts so as to arrive at an exact racial balance in all of the schools in Marion County.

## II

Having considered all of the evidence in this case, the Court is of the opinion, and now finds that Plan A, with certain modifications as hereafter described, is best adapted to overcome the combined effect of the constitutional violations previously found by the Court. In this connection it must be remembered that the Court's remedy can be designed to redress only the difference between present racial distribution and what it would have been in the absence of constitutional violations. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *United States v. Board of School Com'rs, Etc.*, 573 F.2d 400, 410 at n.22 (7 Cir. 1978).

In its opinion of July 11, 1978, *United States v. Board of Sch. Commissioners, Etc.*, 456 F.Supp. 183 (S.D.Ind.1978), this Court found as follows:

"The record shows that as of April 30, 1974, HACI owned 2395 apartment units of various sizes, other than those held for rent exclusively to the elderly .... Estimating three school age children per unit, it is apparent that more than 7,000 pupils would have been afforded a desegregated education in the schools of added defendants had the housing units been placed outside IPS. Further, the evidence is that the neighborhoods around housing projects tend to become integrated, so

that others would have moved to the suburban housing areas. The total would approximate the number of students which this court proposes to transfer." 456 F.Supp. at 190.

The "number of students which this court proposes to transfer" was the number set in IPS Exhibit 99, Proposal A Revised, i. e., 6,533 students in grades 1–9 immediately, and an additional 726 per year, more or less, for the next three years, for an eventual total of 8,711.

Additional evidence adduced by IPS and by added defendants LWW indicate that the Court's above mentioned estimate of 7,000 black students directly affected by the HACI housing violation was somewhat high. IPS exhibit 98 reflects the increase of non-white students in the elementary schools serving ten of the eleven public housing projects following the completion of such projects in the late 1960s and early 1970s. By applying the percentage of non-white pupils at each school to the total enrollment immediately before completion of a project, and comparing the result to the number similarly obtained as to the same school during the first or second year after completion (depending upon whether or not completion took place before or after the beginning of a school year), it appears that the number of additional non-white students attending the elementary schools from these ten projects within a year or two after their completion was approximately 2,500.

A school year typical of the years during which these projects were being completed is 1968–69, during which IPS had an enrollment of 98,363 in grades 1–12, of which 72,244 or 73.45% were elementary students. Applying the formula 2,500/73.25 × 100 = total students, grades 1–12, we arrive at a total of 3,404 public housing students residing in the ten projects. These projects contain 1,644 housing units, so that the average number of students per unit would be 2.07. This figure applied to the total of 2,395 units owned by HACI yields a grand total of 4,958 black students from all eleven housing units who would have received

their education in a desegregated suburban school had all public housing been located outside IPS.

The foregoing revised estimate is corroborated to a remarkable degree by LWW exhibits 8 and 10. An actual count was made in July, 1978 of the children ages 6–18 residing in the same ten projects referred to in IPS exhibit 98, and is shown in LWW exhibit 10 to be 2,586. LWW exhibit 8 shows the vacancy percentage in the projects at about that time (specifically, on September 30, 1978) to have been 19.2%. The 2,586 children would therefore constitute those in residence at 80.8% of capacity, and application of the formula 2,586/80.8 × 100 = total school age children with units filled to capacity gives a result of 3,200. The correlation between this figure and the figure of 3,404 arrived at by the Court's first method speaks for itself.

IPS endeavored to show by its first two witnesses that there had been substantial additional constitutional housing violations by governmental agencies. The first witness was Martin E. Sloane, an attorney who is general counsel of an organization which specializes in suing federal, state and local agencies over alleged failures to administer housing and urban development programs in a manner to achieve fair housing goals. He testified as to the location of various types of federally assisted housing within Marion County, and gave an opinion that such housing was located and occupied on a racially segregated basis, both inside and outside IPS. The Court finds that, with the obvious exception of the public housing projects, there is no factual basis in the record for such opinion.

To take an example, the witness testified that federally subsidized housing projects (apartments) constructed under Sections 221(d)(3) and 236 of the housing laws were constructed in areas which, in his opinion, were racially identifiable. Basically, his testimony is that all such projects built inside IPS were built in black residential areas and occupied for the most part by blacks, while all of those in the suburbs were built in white residential areas and

occupied for the most part by whites. However, IPS exhibit 24 demonstrates that of the seven new Section 236 projects built inside IPS only three (Caravell Commons, Orchard Park, and Parkview) were built in black residential areas. Again, only two of the six new Section 221(d)(3) family projects built inside IPS were built in black residential areas (Riverside and Andrews Gardens).

It is true that thirteen out of sixteen Section 236 projects built in the suburbs were built in areas where the non-white population was zero in 1970, and was only 2%, 6%, and 22% in the other three locations. It is also true that of the seventeen Section 221(d)(3) family housing projects built in the suburbs, fourteen were built in areas where the 1970 non-white population was zero, and the other three in areas where the applicable percentage was 2%, 2%, and 6%. There is, however, no evidence that such suburban construction by private builders was done with any intent to segregate; indeed, given the fact that the population of the suburbs at the time of the construction in question was overwhelmingly white, as shown by other exhibits, it would have been difficult to place an apartment project in an area that was not virtually all white.

The fact that the placement of federally subsidized housing projects in white suburban areas, so that members of minority races and economically deprived persons of whatever race may enjoy the amenities of such neighborhoods, has long been a goal of such organizations as that for which the witness acts as general counsel. In the Chicago area it has required years of litigation to secure such a result. *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). In the case at hand, this Court has enjoined the defendant HACI from any further construction or subsidization of family housing units within the boundaries of IPS, with the obvious corollary that if there is to be any further construction of this type it will be in the suburbs. The testimony of the witness that it is discriminatory to put subsidized housing in a white suburban area is incredible.

That the view of *Gautreaux* and of this Court is correct is amply demonstrated by said IPS exhibit 24, which shows that a great many of the outside IPS projects built in white census tracts now have substantial numbers of black tenants, particularly in Pike, Washington, and Lawrence Townships, contrary to the testimony of the witness. This is shown by IPS exhibits 27, 28, and 29. This, of course, helps to account for the substantial increase in the number of black pupils in the schools of these three added defendants during the past few years.

The witness testified further that all Section 236 rehabilitation work had been performed within IPS on projects having a largely black occupancy. This is true. However, absent further evidence from which a racial bias could be inferred (and there is none), the only inference which the Court can draw from this fact is that the inner city contains older structures which are in greater need of rehabilitation than those in the suburbs.

The second witness gave evidence regarding the 1978 failure of the Uni-Gov City-County Council to authorize the location of federally assisted scatter-site housing throughout Marion County, including the suburbs, and also gave evidence to the effect that HACI, in collaboration with state and federal agencies, may be attempting to evade the Court's injunction against the erection of additional subsidized family housing within IPS. This evidence may well lead to further proceedings against HACI, but is otherwise of little help in arriving at an appropriate remedy.

III

The other constitutional violation found by this Court to have had an interdistrict effect was the enactment of the Uni-Gov law, and its companion legislation. Such finding as to the effect of this legislation has been confirmed by the Court of Appeals. *United States v. Bd. of Sch. Com'rs of City of Indianapolis*, 541 F.2d 1211, 1220 (7 Cir. 1976); *id.*, 573 F.2d 400, 408 (7 Cir.

1978). However, under *Dayton* the Court is now required to assess the incremental effect of such legislation, which was enacted in 1969. This is impossible to do.

If Uni-Gov had changed existing school district lines, it would not be difficult to compute the number of school children of the two races on each side of the lines before and after the change. However, as Judge Tone points out in his dissent, 541 F.2d 1211, 1227 at n.7, failing to redraw school district lines is not the same as redrawing school district lines. IPS, in its new role as advocate of county-wide racial balancing, argues that but for Uni-Gov exclusion of school districts from its enlargement of the city of Indianapolis, the IPS boundaries would now be coterminous with those of the civil city. This would be true, if one assumes that Uni-Gov could have and would have been enacted sans those two provisions, but this Court has previously found that without them Uni-Gov would not have been enacted. 456 F.Supp. 183, 187.

Statistically, IPS exhibit 64 demonstrates that the number of black children in suburban schools has increased from 1,220 in school year 1968–69, the last year before Uni-Gov, to 4,392 in the current school year 1978–79—an increase of 360%. During the same period of time, the number of blacks in IPS schools has declined slightly, from 36,586 to 34,962. Had black families taken advantage of the Section 236 and Section 221(d)(3) existing housing situated in Decatur, Wayne, and Perry Townships, as shown on IPS exhibit 27, to the same extent that they have done in Pike, Lawrence, and Washington Townships, shown on the same exhibit, the number of black students in schools of the former townships would be substantially higher.

The Court surmises that the increase in the number of black families residing in the suburbs is more likely attributable to passage of the Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq. than to the passage of Uni-Gov in 1969. However this may be, it remains that there are no facts in evidence from which the incremental effects of Uni-Gov may be determined in terms of numbers of students who were caused to move to or from IPS.

## IV

The greater part of the IPS testimony at the November 6 hearing was devoted to an effort to prove that the various acts of *de jure* segregation heretofore found to have been committed by the predecessors in office of the present members of its Board, such as manipulating boundaries, creating optional attendance zones, using temporary classrooms, erecting new buildings in one-race areas, etc., all within IPS, had an inter-district effect sufficient to justify its proposed county-wide remedy. The cumulative testimony of various expert witnesses was adduced, all to the effect that each violation would tend to identify certain schools and neighborhoods inside IPS as black, and that this would cause whites to live in the suburban areas.

■ The Court rejects such sociological and psychological opinion testimony as being without foundation. None of such IPS witnesses relied upon any of the wealth of statistical data in evidence as furnishing a predicate for his testimony. Instead, the Court is simply asked to "trust the experts," because they have previously testified to the same effect in many other desegregation cases. The Court is unable to do so, because it finds their conclusions to be illogical, as will be demonstrated.

The witnesses, of course, must begin with the assumption that many whites do not want their children to go to school with black children, or at least not with large numbers of black children. This assumption will be taken to be true. Now, assume that city school corporation X has a student population 40% black and, in the same county, adjoining suburban school corporation Y has a student population 1% black. Assume that the schools of X are desegregated, with the racial balance being approximately equal in the various schools. Under these circumstances the white family head with school children (W), having the racial bias assumed by the IPS witnesses, upon moving

into the county for the first time would, as a matter of logic, always elect to locate in Y, other things being equal. Assume, on the other hand, that the schools of X are segregated, with many all-white schools. In these circumstances, W could logically decide to locate inside X, near one of such white schools, if he believed that the situation would remain the same for a substantial period of time. It may therefore be seen that segregation in X would be more likely to attract W to X, or to keep a white family from leaving X, than the reverse, as testified by the experts.

The truth of the foregoing exercise in logic may easily be demonstrated by the statistical evidence in the case. IPS exhibit 64 shows that before this action was filed, when IPS schools were substantially segregated, the 1968–69 enrollment of white pupils in IPS, grades K–12, was 72,025. Since the action was filed and the former all-white schools desegregated, white pupil population has dropped to 38,693, a catastrophic decrease of 33,332 white pupils or 46.3% of the 1968–69 number.

On the other hand, the school population of the ten suburban school corporations in Marion County in 1968–69, at which time they were 98.3% white, was 70,749. White school population in IPS commenced to drop immediately after the filing of this action, but at the same time the number of pupils rose rapidly in the ten suburban school districts until this Court's decision of August 18, 1971, 332 F.Supp. 655, which suggested the necessity of involvement of the suburban schools. For the school year 1971–72, total enrollment in these schools was 77,125, an increase of 6,376 pupils, or 9% in only three years. But with the threat of a county-wide remedy, the total enrollment in these schools has declined to 70,883 for the current school year, a loss of 6,242 or 8.09%. The decrease in white students is even more pronounced, being from 75,025 to 66,491—a decrease of 8,534 or 11.37%.

That these reductions in white pupils, first from IPS territory and then from the area of the ten Marion County suburban school districts, are attributable to the actu-ality (within IPS) or the likelihood (outside IPS) of desegregation, rather than to the nationally recognized phenomenon of a falling white birth rate may also be demonstrated by the record. In its decision of July 20, 1973, as corrected November 12, 1973, 368 F.Supp. 1191, aff'd in part, rev'd in part and remanded 503 F.2d 68 (7 Cir. 1974), this Court adjudged thirteen additional added defendant school corporations, which adjoin but are outside Marion County, to be subject to participation in the desegregation of IPS. This part of the Court's judgment was reversed on the basis of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), thus freeing these virtually all-white school corporations from the possibility of being required to accept black students from Marion County.

These corporations actually abut eight of the ten Marion County suburban school corporations, and more than 60% of their residents are employed in Marion County. 368 F.Supp. 1191, 1206 and 1216. However, while the number of white students in the inside suburban corporations was declining by 11.37%, as above noted, the total school population of the outside suburbs rose from 39,779 in 1973–74 to 44,386 in the current school year, as shown on LWW exhibit 11, a total of 4,607 or 11.6% in the other direction.

■ In summary, it cannot be demonstrated that acts of *de jure* segregation practiced by one school corporation within its own boundaries have any significant effect upon school or residential populations in adjoining school corporations. In contrast, it appears that desegregation tends to cause white flight from school corporations which are or may be involved therein. The IPS experts are simply wrong, and have failed to furnish a basis for the adoption of Plan C.

V

■ The LWW plan is rejected because, in the first place, it does not go far enough. Only the added defendants Warren and Wayne Metropolitan School Districts agree to accept any significant number of black

students from IPS other than on a voluntary transfer basis. As to Warren and Wayne, such corporations only agree to annex territory of IPS sufficient to increase their black student enrollment to 7.5%; further, they specifically describe the territory which they would be willing to annex, so that any variation in either territory or numbers would enable them to withdraw consent.

To order annexation without consent, whether by Warren, Wayne, or any other defendant or added defendant, would raise a completely new set of legal questions at a very late date, and would foreseeably cause substantial added delays. However, the idea of annexation is good in theory, and IPS will be directed, in its preparation of a second revision of Plan A, to attempt to select black transfer students from areas which are contiguous to the receiving school corporation, if that may be done consistent with other relevant criteria. To the extent that this may be done, it is apparent that IPS and the receiving school corporations may then enter into voluntary annexation programs, if they desire to do so, agreeable to Indiana law. Burns Ind.Stat.Ann., Code Ed., §§ 20–3–14–1, et seq. It may even be possible under existing Indiana law to annex noncontiguous territory by consent; if not, a simple act of the legislature could make it possible to do so.

The United States has also, at the eleventh hour, suggested annexation. Its reverse annexation idea is for IPS to annex all or part of the territory of the suburban school corporations. With its usual ambivalence, it first states that such an attempted annexation would be subject to remonstrance, but then suggests that this Court could divest the state court of jurisdiction of the remonstrance proceeding and, in effect, quash it if unhappy with its progress. For the same reason given in the first sentence of the preceding paragraph, the Court declines to consider this suggestion.

## VI

IPS Plan B is rejected because this Court has already found that it has no power to order that a suburban child be transported out of its own school corporation so long as the suburban school corporations remain as separate legal entities, because there is no evidence that any of them has operated anything other than a unitary school system. *United States v. Board of Sch. Com'rs of Indianapolis, Ind.*, 368 F.Supp. 1191, 1208 (S.D.Ind.1973), rev'd in part on other grounds and remanded, 503 F.2d 68 (7 Cir. 1974). In any event, the Court finds that the effect of Plan B would be to double the number of students required to be bused under Part I of Plan A, without any corresponding benefit to any party to this action, or to any person.

The basis for Plan B is simply that IPS characterizes Part I of Plan A as "one-way busing," and takes the position that this is inequitable because it places the "burden of desegregation" on blacks. IPS witness Dr. Green testified in opposition to Plan A at great length under an offer to prove to the effect that (1) black children are handicapped by receiving an inferior education in segregated schools, but are being required to "pay a second price" when asked to go into white communities, and (2) when white children are bused into previously all black areas, white parents and school administrators become concerned about "quality education," and the schools are improved.

Dr. Green's dialectic as regards his argument (1) contains an obvious non sequitur. His second reason is based upon an assumption that IPS schools presently serving a high percentage of black students are inferior to other schools in the IPS system in terms of program, facilities, and staff. In addition to the fact that there has never been an issue presented in this case on such point, the further fact that faculty and staff have been desegregated for almost ten years, and that the programs in all of the schools are identical, save for some special new pilot programs in the elementary schools and the new "magnet" programs in certain high schools, the witness has entirely overlooked Part II of Plan A. Part II, which works with Part I as part of an overall plan to desegregate finally each

identifiable black school remaining in the IPS system, calls for the transfer of a substantial number of white students residing within IPS into schools which are substantially all black. In fact, Part II considered alone, as presently written, would transport more white students than black students. This, of course, meets Dr. Green's point two, even assuming it to be valid. As to facilities, IPS compliance with Plan A, Part I will afford it the opportunity to discontinue obsolete school buildings.

As stated by this Court in the previous opinion just cited, *supra*, the Supreme Court has not addressed itself specifically to the constitutionality of one-way busing (more accurately, one-race busing), but in *McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971), approved a plan which did just that. However, Plan A, considered as a whole, is not such a plan because it calls for the busing of many students of both races.

It is true that in Part I only, it is black students who are being bused to suburban schools from IPS, and no white students are being bused back to IPS. But the students who will be the classmates of such IPS transferees are themselves bused to school, for the most part. As shown in Figure 8, attached to this Court's opinion of July 20, 1973, 368 F.Supp. 1191, 1218, all of the suburban schools with the exception of Speedway bus a great majority of their pupils, ranging from 62.34% in Beech Grove to 90.71% in Warren Township and 91.45% in Decatur Township. The suburban schools are not neighborhood schools but drive-in schools, and this Court fails to see why it is more of a "burden" for a black child to ride in comfort to such a school than for a white child to do so. As was said in *Higgins v. Board of Education of City of Grand Rapids*, 508 F.2d 779 (6 Cir. 1974), in affirming a voluntary plan which employed, among other things, the one-way busing of blacks from the inner city to certain outlying schools, all within the one school corporation of Grand Rapids, "... [I]t is only natural that a program of bussing for desegregation purposes will affect those in the compacted inner-city more than those in the suburbs. The latter are ... more likely to have been bussed already for simple transportation reasons."

*Hart v. Community School Bd. of Ed., N. Y. Sch. Dist. # 21*, 512 F.2d 37 (2 Cir. 1975), affirmed an order of the district court directing that Mark Twain Junior High School, a segregated black school, be converted into a magnet school and that its students, as well as students of certain predominately white schools, be bused to other middle schools. The plaintiff class of black children attending Mark Twain appealed on the basis that the solution was unconstitutional in that it would bus 1,050 minority students as opposed to 650 white students. The Court found that "the 'burden' of busing cast upon minority students is only a 'somewhat heavier burden' .... A 'somewhat heavier burden' has to fall somewhere, either on white or minority students as a class." The difference in numbers was not deemed significant.

This Court does not consider that riding a reasonable distance to and from school in a bus with children from one's neighborhood imposes any burden upon the child thus transported. Certainly no physical burden is imposed, and no mental burden would seem to be involved except to the extent that it might be suggested or induced by the parent—a matter which no court can control. In inclement weather, busing clearly confers a benefit to health, comfort, and safety. In any event, there will be little difference between the number of white children bused to school and the number of black children bused to school under Plan A, when the plan is considered as a whole.

Finally, the remedy ordered by this Court, now referred to as Plan A, has already been considered by the Court of Appeals for the Seventh Circuit and approved. *United States v. Bd. of Sch. Com'rs of City of Indianapolis*, 541 F.2d 1211 (7 Cir. 1976). Although this holding was subsequently vacated and remanded, 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977), the remand to the Court of Appeals was solely for further

consideration in the light of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). These cases involve the issue of racially discriminatory intent or purpose. Since the attention of the Court of Appeals was not directed to *Milliken v. Bradley, supra,* there is no indication that the Supreme Court entertained reservations regarding the propriety of the interdistrict remedy ordered by this Court.

## VII

■ This Court has herein found the number of black pupils directly affected by the HACI housing programs to be 4,958. This does not mean that the Court is limited to this number of interdistrict transfers, inasmuch as the Court has also found that when black occupied public housing projects are built in formerly white residential areas, there tends to be some movement by blacks into private housing in the areas. 456 F.Supp. 183 at 190. LWW exhibits 7 and 7A illustrate such finding. Although the direct effect of the other constitutional violations found by the Court cannot be demonstrated statistically, it is reasonable to infer a moderate indirect effect. The Court's estimate is that the total number of black children affected by all violations, both directly and indirectly, that is, the number who would more likely than not be living in a suburb and attending a desegregated suburban school but for such violations, is from 8,000 to 8,500 children.

The number of black school children to be transferred to each of the eight transferee school corporations, as previously ordered by the Court on August 1, 1975, which order was reinstated and confirmed after remand on July 11, 1978, shall remain the same, with one exception. There is a substantial demographic change in the Metropolitan School District of Lawrence Township, in which the percentage of black pupils in grades 1–9 has now reached approximately 9%, as shown on LWW exhibit 4. Therefore, the Court finds that the number of black pupils to be transferred to said added defendants should be reduced from 930 to 443. With respect to the remaining school corporations designated to receive transfers, the changes in school populations which have occurred since the 1974–75 school year are not of sufficient significance to warrant any change.

With respect to added defendants Metropolitan School District of Pike Township and Metropolitan School District of Washington Township, it is noted that continuing demographic change in such districts has resulted in an increase in their percentage of black students to 19.28% and 19.01%, respectively. IPS exhibit 64. This being true, the Court finds that neither of them should be involved in the remedy in this action, and that the action should now be dismissed as to each of them. In this connection, even Dr. Foster, the author of IPS Plan C, testified that it was not necessary to involve either of these two school corporations in order to put his plan into effect, and that to transport approximately the same number of black students into and out of such corporations "would not make much sense."

The IPS director of planning testified as to the matters taken into consideration, and the methods by which Plan A was put together. Although the result appears to be generally workable, the evidence is that somewhat more children are required to be bused than would be true if another method had been used. This result obtains from the fact that Part I was developed before Part II, and the fact that IPS required that its four area high school attendance concept be rigidly followed.

■ All of the witnesses who testified on the subject agreed that there was no educational advantage in the four area concept, and that it made the preparation of desegregation plans more difficult. Indeed, the testimony is that no other school in the United States establishes its feeder patterns by starting with the high schools and working down, as does the four area system, rather than by starting with the elementary schools and working up. This

would be none of the Court's business if the only result was administrative awkwardness, but when the four area plan makes it necessary to divide neighborhoods which would normally be sending children to the same school, and requires the busing of children who would otherwise be walking, thus erecting additional obstacles to the drawing of a reasonable desegregation plan, then it does become the business of the Court. In accomplishing its further revision of Plan A, IPS will be directed to ignore and abolish its present high school area lines. After new attendance zones, and pairing and clustering patterns, as needed, are established for the elementary and upper elementary schools—in that order—IPS will, of course, be free to set up such high school attendance areas as it deems appropriate, so long as elementary and upper elementary assignments are not affected.

Another harmful impact of the four area plan is that it would require the separation of some existing pairs, clusters, and rezoned elementary attendance areas which have worked well since establishment of the interim plan of 1973. That plan has now been in effect for almost six school years, and the great majority of the elementary schools affected by it have relatively stable black-white enrollments. Obviously, schools which are presently desegregated and stable should not be disturbed unless absolutely necessary to accomplish the desegregation of a presently identifiable black school—a concept with which IPS experts agree.

Therefore, IPS is directed to make and propose a second revision of Plan A, which will first look to desegregating as many as possible of the elementary schools presently having an enrollment more than 60% black by use of the techniques of changing attendance boundaries, pairing, and clustering without the use of bus transportation. After this has been accomplished, IPS may proceed with Part I (the outside transfer plan) and Part II (transfers inside IPS), as a unified plan, giving appropriate weight to such factors as maintaining existing patterns which are both desegregated and stable, the proximity of areas from which children are to be transferred to suburban schools to the borders of such transferee school corporations, neighborhood patterns in areas from which students are to be transferred, the time and distance involved in transportation of pupils, and obsolete school buildings in which programs may be discontinued. Such revised plan shall be submitted within ten days from the date hereof.

## VIII

In response to the order of this Court of July 11, 1978, the defendant Superintendent of Public Instruction developed an in-service training program, which has been the subject of criticism by added suburban defendants, as well as by certain of the IPS and Government witnesses. At the request of the Court, the witness Dr. Herman R. Goldberg, Associate Commissioner for State and Local Educational Programs, United States Office of Education, submitted a posttrial memorandum expressing comments on the Superintendent's plan, and on ancillary programs in general. The Court now adds this memorandum to the record, marked "Court's Exhibit 1." A similar critique by Dr. Robert L. Green, Dean of the College of Urban Development, Michigan State University, appears in the record as IPS exhibit 125. Another view of an appropriate in-service training program is set out as exhibit A to the posthearing brief of Indiana State Teachers Association. It is suggested that all of the ideas contained in these documents be considered in arriving at the final plan herein ordered.

All educator witnesses agree that various forms of ancillary relief must be granted if the desegregation plan is to function with any degree of efficiency. Those which appear from the evidence to be necessary in conjunction with Plan A, and therefore required, are set out immediately hereafter, largely in the words of, or paraphrasing Judge DeMascio in *Bradley v. Milliken*, 402 F.Supp. 1096, 1139–1145 (E.D.Mich.1975), aff'd 540 F.2d 229 (6 Cir. 1976), aff'd *sub*

*nom Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745.

■ (1) *In-Service Training*: A comprehensive in-service training program is essential to a system undergoing desegregation. All participants in the desegregation process must be prepared to deal with new experiences that inevitably arise. By "all participants" is meant not only teachers and administrators, but also bus drivers, office personnel, and other employees of the school corporation. Such fields as student expectations, teacher expectations, minority culture, human relations, testing of minority students, the student code of conduct and the administration of discipline shall be included. The program shall also include an explanation of the school desegregation cases, beginning with *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and shall include a summary of the published decisions in this case, giving particular attention to the history of segregation in Indiana and in IPS, as set out in sections III–V of this Court's first opinion in this case, 332 F.Supp. 665.

■ It is known that the attitudes of teachers and other school personnel toward students may be affected by desegregation. These attitudes play a critical part in the atmosphere of a school and affect the pulse of the school system. Teachers, both white and black, often have erroneous expectations of the ability and worth of students of the opposite race, or from different socio-economic groups. These expectations must, through training, be reoriented to insure that academic achievement of black students in the desegregation process is not impeded.

■ The in-service training program as instituted should be ongoing, conducted during the school year and just prior to the opening of school.

■ (2) *Testing and Curriculum Development*: Of great importance to children undergoing desegregation is the assurance that tests administered to them are free from racial, ethnic and cultural bias. As a result of biased testing procedures, black children might find themselves segregated in classrooms for slow learners, which would thereafter impede their educational growth. Therefore, all involved school corporations, in cooperation with the State Superintendent, should review their testing programs and make such changes as may be required, if any, to insure that testing design, content and procedures are adapted to a desegregated school system.

■ Similarly, the curriculum should be reviewed, having in mind the necessity to present materials free from cultural bias. History courses, for example, which ignore the contribution of racial and ethnic groups are antithetical to the successful implementation of a viable desegregation plan. Therefore, all schools should assess their curricular offerings for evidence of cultural bias. If present, this bias should be replaced by instruction which is in keeping with the goal of cultural pluralism.

The foregoing does not mean that the various school corporations will lose local control with respect to testing and curriculum development, but simply that they will conduct ongoing, systematic evaluations of the same in order to carry out the foregoing purposes.

■ (3) *Student Rights and Responsibilities*: It is assumed that all of the involved school corporations presently have written codes of student conduct. If not, such should be prepared forthwith. Such codes should not only set out conduct which is proscribed, but should also afford the student minimal rights of due process, consistent with *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). All students and staff members must be made aware of both aspects of the code. The code should, on the one hand, assure that disruptions in the school or classroom will be dealt with in every instance, and on the other hand protect the students against arbitrary and discriminatory exclusions, suspensions, or expulsions.

■ (4) *Counseling and Career Guidance*: School desegregation may place psychological pressures upon the students af-

fected, particularly upon those going from a segregated, majority black school to a desegregated school. Because of their training in conflict resolution, school counselors and guidance personnel should provide special leadership to ease the process of desegregation. It may be necessary to involve guidance counselors in a further intensive training program, or to hire additional personnel, in order to meet the needs of filling leadership roles in working with administrators, faculty, staff, parents and students.

Care must be taken to avoid the banishing of minority students to programs of study or occupational goals that are less demanding than their talents—present or potential—would indicate.

█ (5) *Reading and Communication Skills*: It is obvious that the development of proficient reading skills is the most essential educational service a school system can deliver. Likewise of great importance is the ability to communicate verbally in readily understood English. Although the preliminary projection of desegregation costs made by IPS included a large sum for remedial teaching programs in such areas, there was no substantial evidence as to the necessity therefor. However, an initial assessment should be undertaken upon the transfer of pupils to determine what precise skills necessary for student success might be missing, if any. To the extent required, remedial programs should be undertaken.

█ (6) *School-Community Relations (Parental Involvement)*: A detailed plan for a community relations program should be developed, which should include provisions for school-community liaison and parental involvement. To achieve maximum community participation the program should depend upon parental support; participants should be selected voluntarily and serve without compensation. An effective community relations program must develop a partnership between the community and the schools and must cooperate with traditional groups such as parent-teacher organizations. Parents of black children transferred to suburban schools should be advised of their eligibility for membership in the parent-teacher organizations of such schools.

There should be a cooperative flow of information from the schools to the community and from the community to the schools. Open and free discussion and participation in the desegregation process should be encouraged. The school-community relations organization should receive complete encouragement, budgetary support, direct assistance and a free flow of information from school authorities.

█ (7) *Monitoring*: The Court's order will provide for a Court-created monitoring system to audit efforts made to implement the Court's desegregation orders. The monitoring system created by the Court will provide for broad citizen participation. The monitoring group will reflect the racial and ethnic composition of the involved school corporations so that input may be received from a broad spectrum of the population.

Because it is the Court's constitutional obligation to audit efforts to implement its orders, the monitoring commission shall report directly to the Court. The parties may, for the Court's consideration, nominate citizens for appointment to the monitoring commission. The Court is of the view, however, that the State, to whom the Fourteenth Amendment is addressed, has an equal obligation to oversee the efforts put forth and results achieved through implementation of the desegregation order. Accordingly, the Court will order the State Superintendent of Public Instruction to seek the assistance of available state institutions to provide the supervisory and expert support staff needed to analyze and report the information thus obtained.

## IX

*Procedure and Funding*: In developing the foregoing guidelines, it is not the intent of this Court to usurp the administrative authority of the school board of any of the involved nine school corporations, or of the State Superintendent of Public Instruction. Neither has this Court intended to substitute its authority for the authority of elect-

ed state and local officials to decide which educational components are beneficial to the various school communities.

It is the desire of the Court that the parties work together with the State Superintendent of Public Instruction to implement the various goals and programs above set out, and they are directed to do so. The State Superintendent shall be responsible for submitting a complete program for the Court's approval within thirty days of the date of this order, and the various school corporations are directed to send their superintendents or superintendents' designees to meet with the State Superintendent at such times as he may find necessary. In this connection, the Court observes that IPS has already had a great deal of experience and success in developing and implementing programs similar to the above in connection with the 1973 interim desegregation plan, and that the superintendents of some of the suburban school corporations who testified at the last hearing appear to have a great deal of expertise in this field. Such facts suggest that the Court's deadline may easily be met and probably surpassed.

Further, the suburban schools were directed to commence in-service training by the Court's order of July 11, 1978, which order has never been stayed. Therefore, pending the development of a final program as herein ordered, the suburban schools should commence or continue their present programs without further delay.

■ All involved school corporations and the State Superintendent of Public Instruction are directed to proceed forthwith to make application for all federal funds available and reasonably required to carry out the ancillary relief above ordered; funds for programs of this kind are available through the Emergency School Aid Act and Title IV of the Civil Rights Act, to name two possible sources.

To the extent that federal funds are insufficient to defray all costs of ancillary relief, if at all, the balance shall be paid by the defendant State of Indiana out of funds otherwise unappropriated. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745. Provided, however, that if any of the suburban schools or IPS shall fail and neglect to make prompt application for federal funds, or to follow its application with all due diligence, then such school corporation shall not be entitled to reimbursement by the State for its costs incurred in connection with such programs. It shall be the duty of the defendant State Superintendent of Public Instruction and the defendant Governor of the State of Indiana to make the necessary arrangements for the payment of said costs, if required.

An order will issue later regarding responsibility for the cost of the school buses required to implement Plan A, following hearing on the claim for relief of IPS against the State Board of Tax Commissioners.

## X

■ It is recognized that implementation of Plan A will render surplus some IPS teachers. On the other hand, the suburban schools will be in need of additional teachers. Such schools should not attempt to accommodate transferred students merely by increasing class sizes, as to do so would work a hardship upon all of its students, as well as its present teachers, and would enable the suburban schools to collect windfall profits in their tuition charges.

As a matter of fundamental fairness, IPS surplus teachers should have the first opportunity to be hired by the suburban schools. This fact has been recognized by the suburban school corporations which adopted the LWW plan. The Court therefore adopts, and makes a part of its order, a composite of the LWW plan and the plan of the added plaintiff Indiana State Teachers Association as follows:

■ A. *Selection of Surplus IPS Teachers*: IPS will determine the number of teachers who must be declared surplus as a result of the transfer of students to other

school corporations. IPS is instructed to consider its normal staff turnover and attrition in determining this number.

IPS is instructed to attempt to meet this number by first seeking volunteers for transfer to other school corporations from the IPS faculty at large. If the number of volunteers is not sufficient, IPS is instructed to release teachers by seniority within IPS, within the definition of seniority contained in Article X, Section 11 of the Agreement between IPS and the Indianapolis Education Association (ISTA exhibit 14, p. 44), subject to any requirements imposed by Indiana statute, and subject to the requirement that the percentage of black teachers released may not exceed the percentage of black teachers throughout IPS.

Volunteers and persons selected by seniority shall constitute an "available pool" of surplus IPS teachers. The available pool will not include any person whom IPS has determined not to rehire for reasons other than a reduction of staff.

■ B. *Hiring of IPS Teachers by Other Corporations*: In acquiring additional teaching personnel for the three school years commencing with the year 1979–80, each transferee school corporation is required to make offers to qualified persons from the available pool before offering such employment to others, making offers to black teachers in the pool in no less proportion than their representation in the pool. Each transferee school corporation shall publicize the existence of employment opportunities on its staff to each member of the available pool who holds an appropriate license or certificate. Employment shall first be offered to persons who volunteered for the pool, then to persons who were involuntarily selected.

C. *Conditions of Employment*:

■ 1. Salary and other conditions of employment will be those applying to all teachers within the transferee school corporation.

■ 2. Persons employed from the pool are entitled to the same status as nonpermanent, semipermanent, or permanent teachers in the transferee school corporation as they would have held in IPS (I.C. 20–6.1–4–14; I.C. 20–6.1–4–9.5; I.C. 20–6.-1–4–9), and are entitled to the same number of years credit toward semipermanent or permanent status in the transferee school corporation as they would have held in IPS. Years of employment in IPS and in the transferee corporations will be treated as consecutive years of employment in the transferee school corporation for all purposes.

■ 3. Once a teacher has been offered a teaching job in any transferee school corporation and has taken or declined the same, the teacher shall no longer be a part of the available pool.

## XI

The attorneys for the prevailing parties, the intervening plaintiffs Buckley, are entitled to attorneys fees herein, but the fixing of such fees must necessarily be deferred until any appeals are finally concluded.

An appropriate order and judgment will be issued in accordance herewith.

## JUDGMENT

The court having on April 24, 1979 filed a memorandum of decision in the above entitled action (Indianapolis VI), containing various findings requiring orders and judgments, such orders and judgments are hereinafter set out.

Recognizing that some or all of the parties to this proceeding may wish to appeal the judgments entered herein by this court as to them, and as a convenience to all parties, this court will designate by separate subnumber that particular judgment directed against each particular defendant or defendants, in order that the parties appealing may properly designate in any notice of appeal filed herein that particular

judgment or judgments so appealed. The defendant The Board of School Commissioners of the City of Indianapolis, Indiana will be referred to as "IPS." The matter of transfer of pupils will be accomplished and continued in accordance with the applicable provisions of this court's Memorandum of Decision (Indianapolis IV), entered August 1, 1975, its Memorandum of Decision (Indianapolis V), entered July 11, 1978, and its Memorandum of Decision (Indianapolis VI), entered April 24, 1979, all of which provisions are incorporated in each subparagraph as if set forth herein. The plan of IPS entitled Plan A, Part I (Second Revision), as filed May 11, 1979, is adopted as the plan for supplying the geographic areas within IPS from which black students will be transferred, as more particularly hereafter set out.

a. IP 68–C–225A. It is ordered and adjudged that IPS is directed to transfer to The Metropolitan School District of Decatur Township, Marion County, Indiana approximately 576 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area A, the description and map attached to and forming a part hereof. Said transferee school corporation is ordered to accept such transfer students and enroll them accordingly.

b. IP 68–C–225B. It is ordered and adjudged that IPS is directed to transfer to The Franklin Township Community School Corporation, Marion County, Indiana, approximately 346 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until the further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area B, the description and map attached to and forming a part hereof. Said transferee school corporation is ordered to accept such transfer students and enroll them accordingly.

c. IP 68–C–225C. It is ordered and adjudged that IPS is directed to transfer to The Metropolitan School District of Lawrence Township, Marion County, Indiana, approximately 447 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until the further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area C, the description and map attached to and forming a part hereof. Said transferee school corporation is ordered to accept such transfer students and enroll them accordingly.

d. IP 68–C–225D. It is ordered and adjudged that IPS is directed to transfer to The Metropolitan School District of Perry Township, Marion County, Indiana, approximately 1,560 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until the further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area D, the description and map attached to and forming a part hereof. Said transferee school corporation is ordered to accept such transfer students and enroll them accordingly.

e. IP 68–C–225E. It is ordered and adjudged that IPS is directed to transfer to The Metropolitan School District of Warren Township, Marion County, Indiana, approximately 1,213 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until the further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area E, the description and map attached to and forming a part hereof. Said transferee school corporation is or-

dered to accept such transfer students and enroll them accordingly.

f. IP 68–C–225F. It is ordered and adjudged that IPS is directed to transfer to The Metropolitan School District of Wayne Township, Marion County, Indiana, approximately 1,409 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until the further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area F, the description and map attached to and forming a part hereof. Said transferee school corporation is ordered to accept such transfer students and enroll them accordingly.

g. IP 68–C–225G. It is ordered and adjudged that IPS is directed to transfer to the School City of Beech Grove, Marion County, Indiana, approximately 335 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until the further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area G, the description and map attached to and forming a part hereof. Said transferee school corporation is ordered to accept such transfer students and enroll them accordingly.

h. IP 68–C–225H. It is ordered and adjudged that IPS is directed to transfer to the School Town of Speedway, Marion County, Indiana, approximately 239 Negro students to be enrolled in grades 1–9 for the 1979–80 school year, and to make continuing transfers of such students for ensuing school years, until the further order of the court. Such students will be all of those Negro students in grades 1–9 residing within the area designated as Transfer Area H, the description and map attached to and forming a part hereof. Said transferee school corporation is ordered to accept such transfer students and enroll them accordingly.

i. IP 68–C–225I. IPS teachers rendered surplus as a result of the above orders shall be entitled to be hired by the transferee corporations, as vacancies occur, according to the following plan:

A. *Selection of Surplus IPS Teachers*: IPS will determine the number of teachers who must be declared surplus as a result of the transfer of students to other school corporations. IPS is instructed to consider its normal staff turnover and attrition in determining this number.

IPS is instructed to attempt to meet this number by first seeking volunteers for transfer to other school corporations from the IPS faculty at large. If the number of volunteers is not sufficient, IPS is instructed to release teachers by seniority within IPS, within the definition of seniority contained in Article X, Section 11 of the Agreement between IPS and the Indianapolis Education Association (ISTA exhibit 14, p. 44), subject to any requirements imposed by Indiana statute, and subject to the requirement that the percentage of black teachers released may not exceed the percentage of black teachers throughout IPS.

Volunteers and persons selected by seniority shall constitute an "available pool" of surplus IPS teachers. The available pool will not include any person whom IPS has determined not to rehire for reasons other than a reduction of staff.

B. *Hiring of IPS Teachers by Other Corporations*: In acquiring additional teaching personnel for the three school years commencing with the year 1979–80, each transferee school corporation is required to make offers to qualified persons from the available pool before offering such employment to others, making offers to black teachers in the pool in no less proportion than their representation in the pool. Each transferee school corporation shall publicize the existence of employment opportunities on its staff to each member of the available pool who holds an appropriate license or certificate. Employment shall first be offered to persons who volunteered

for the pool, then to persons who were involuntarily selected.

C. *Conditions of Employment:*

1. Salary and other conditions of employment will be those applying to all teachers within the transferee school corporation.

2. Persons employed from the pool are entitled to the same status as nonpermanent, semipermanent, or permanent teachers in the transferee school corporation as they would have held in IPS (I.C. 20–6.1–4–14; I.C. 20–6.1–4–9.5; I.C. 20–6.1–4–9), and are entitled to the same number of years credit toward semipermanent or permanent status in the transferee school corporation as they would have held in IPS. Years of employment in IPS and in the transferee corporations will be treated as consecutive years of employment in the transferee school corporation for all purposes.

3. Once a teacher has been offered a teaching job in any transferee school corporation and has taken or declined the same, the teacher shall no longer be a part of the available pool.

j. IP 68–C–225J. The transferee school corporations hereinabove named are ordered to adopt and administer the In-Service Training Program filed herein by the Department of Public Instruction of the State of Indiana on June 8, 1979, as the same may from time to time be modified, as an on-going program, and conduct the same during the school year and just prior to the opening of school.

k. IP 68–C–225K. The cost of developing and administering said In-Service Training Program shall be paid by the State of Indiana.

l. IP 68–C–225L. It is considered and adjudged that plaintiff, intervening plaintiffs, and the cross-complainant IPS take nothing as to the added defendants The Metropolitan School District of Pike Township, Marion County, Indiana, and The Metropolitan School District of Washington Township, Marion County, Indiana, and this action is now dismissed as to each of them.

The court retains continuing jurisdiction of this action, and the parties thereto, together with the right to modify or supplement any orders or judgments herein or heretofore made.

## BOUNDARY DESCRIPTION

### TRANSFER AREA A

Beginning at the intersection of East 32nd Street and Ruckle Street, east on 32nd Street to Fall Creek; south and west along Fall Creek to Washington Boulevard; north on Washington Boulevard to 31st Street; east on 31st Street to Ruckle Street; north on Ruckle Street to the intersection of East 32nd Street and Ruckle Street, the point of beginning.

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

4/30/79

## BOUNDARY DESCRIPTION

### TRANSFER AREA B

Beginning at the intersection of East 34th Street and North Dearborn Street, east on 34th Street to Sherman Drive; south on Sherman Drive to 28th Street; west on 28th Street to Olney Street; north along Olney Street, *neither side included*, to 30th Street; west on 30th Street to Dear-

born Street; north on Dearborn Street to the intersection of East 34th Street and North Dearborn Street, the point of beginning.

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

4/30/79

N ▲

*George F. Cram Company, Inc.

BOUNDARY DESCRIPTION

TRANSFER AREA C

Beginning at the intersection of East 42nd Street and North Emerson Avenue, east on 42nd Street to Irvington Avenue; south on Irvington Avenue to 40th Street; east on 40th Street to Priscilla Avenue; south on Priscilla Avenue to 39th Street; east on 39th Street to Arlington Avenue; south on Arlington Avenue to 38th Street; west on 38th Street to Emerson Avenue; north on Emerson Avenue to the intersection of East 42nd Street and North Emerson Avenue, the point of beginning.

---

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

4/30/79

N ▲

●George F. Cram Company, Inc

## BOUNDARY DESCRIPTION

### TRANSFER AREA D

Beginning at the intersection of West 38th Street and White River, east on 38th Street to Northwestern Avenue; southeast on Northwestern Avenue to 32nd Street; east on 32nd Street to Ethel Street; south on Ethel Street to 30th Street; west on 30th Street to Northwestern Avenue;

southeast on Northwestern Avenue to Udell Street; west on Udell Street to the Canal; southeast along the Canal to 23rd Street; west on 23rd Street to Harding Street; south on Harding Street to 18th Street; east on 18th Street to Fall Creek; southerly and westerly along Fall Creek to White River; northerly along White River to the intersection of West 38th Street and White River, the point of beginning.

### AND

Beginning at the intersection of East 36th Street (extended) and Fall Creek, east on 36th Street to Orchard Avenue; south on Orchard Avenue to 33rd Street; west on 33rd Street to the Monon-N & W Railroads; southwest along the railroads to 27th Street; west on 27th Street to College Avenue; north on College Avenue to Fall Creek; northeasterly along Fall Creek to the intersection of East 36th Street (extended) and Fall Creek, the point of beginning.

---

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

5/9/79

©George F. Cram Company, In

•George F. Cram Company, I

## BOUNDARY DESCRIPTION

### TRANSFER AREA E

Beginning at the intersection of East 38th Street and Sherman Drive, east on 38th Street to Arlington Avenue; south on Arlington Avenue to 34th Street; west on 34th Street to Emerson Avenue; south on Emerson Avenue to 30th Street; west on 30th Street to DeQuincy Street (extended);

north along DeQuincy Street, *both sides included,* to 32nd Street; west on 32nd Street to Wallace Avenue; north on Wallace Avenue to 34th Street; west on 34th Street to Sherman Drive; north on Sherman Drive to the intersection of East 38th Street and Sherman Drive, the point of beginning.

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

4/30/79

*George F. Cram Company, I

## BOUNDARY DESCRIPTION

### TRANSFER AREA F

Beginning at the intersection of West 16th Street and Goodlet Avenue, east on 16th Street to Warman Avenue; south on Warman Avenue to 12th Street; east on 12th Street to Holmes Avenue; south on Holmes Avenue to 11th Street; east on 11th Street to Pershing Avenue; north on

Pershing Avenue to 16th Street; east on 16th Street to White River; southerly along White River to Michigan Street; west on Michigan Street to Belmont Avenue; north on Belmont Avenue to St. Clair Street; west on St. Clair Street to Warman Avenue; north on Warman Avenue to 10th Street; west on 10th Street to Goodlet Avenue; north on Goodlet Avenue to the intersection of West 16th Street and Goodlet Avenue, the point of beginning.

### AND

Beginning at the intersection of 42nd Street and Meridian Street, east on 42nd Street (extended) and 42nd Street to the Monon Railroad; south along the Monon Railroad to Fairfield Avenue; southwest on Fairfield Avenue to 36th Street; west on 36th Street to Meridian Street; north on Meridian Street to the intersection of 42nd Street and Meridian Street, the point of beginning.

---

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

4/30/79

°George F. Cram Company, Inc.

F-2

°George F Cram Company, In

## BOUNDARY DESCRIPTION

### TRANSFER AREA G

Beginning at the intersection of East 38th Street and the Monon Railroad, east on 38th Street to Fall Creek; southwesterly along Fall Creek to Guilford Avenue; north on Guilford Avenue to 34th Street; west on 34th Street to Park Avenue; north on Park Avenue to the northern boundary (east-

west line) of the School No. 48 site; west along this boundary, and including Central Court South, to Central Avenue; north on Central Avenue to 36th Street; east on 36th Street to Fairfield Avenue; northeast on Fairfield Avenue to the Monon Railroad; northerly along the Monon Railroad to the intersection of East 38th Street and the Monon Railroad, the point of beginning.

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

4/30/79

©George F. Cram Company, In

N ▲

BOUNDARY DESCRIPTION

## TRANSFER AREA H

*Concord Village (West)*

Beginning at the intersection of West St. Clair Street and Moreland Avenue, east on St. Clair Street to Concord Street; south along Concord Street, *neither side included,* to the Penn Central Railroad; northwest along the railroad to Moreland Avenue; north on Moreland Avenue to the intersection of West St. Clair Street and Moreland Avenue, the point of beginning.

*Eagle Creek Village*

This area is north of Cossell Road, south of West Vermont Street, east of Little Eagle Creek, and west of Tibbs Avenue. All street addresses are in the 300 block of Exeter Drive, Berwick Place, and Alton Drive.

---

All parts of the boundary line having street (including Avenue, Lane, Drive, etc.) designations are to be interpreted as in-the-middle-of (the street) unless specifically described otherwise.

4/30/79