UNITED STATES of America, Plaintiff,

Donny Brurell Buckley, Alycia Marquese Buckley, By their parent and next friend, Ruby L. Buckley, on behalf of themselves and all Negro school age children residing in the area served by original defendants herein, Intervening Plaintiffs,

Indiana State Teachers Association, Intervening Plaintiff,

v.

The BOARD OF SCHOOL COMMISSIONERS OF the CITY OF INDIANAPOLIS, INDIANA, Karl R. Kalp, as Superintendent of Schools, James R. Riggs, as President of The Board of School Commissioners; Mary E. Busch, Lillian M. Davis, Robert D. DeFrantz, Walter Knorr, Donald G. Larson, Patricia Welch, Members of the Board of School Commissioners of the City of Indianapolis, Defendants,

Otis R. Bowen, as Governor of the State of Indiana, Theodore L. Sendak, as Attorney General of the State of Indiana, Harold H. Negley, as Superintendent of Public Instruction of the State of Indiana, the Metropolitan School District of Decatur Township, Marion County, Indiana, the Franklin Township Community School Corporation, Marion County, Indiana, the Metropolitan School District of Lawrence Township, Marion County, Indiana, the Metropolitan School District of Perry Township, Marion County, Indiana, the Metropolitan School District of Pike Township, Marion County, Indiana, the Metropolitan School District of Warren Township, Marion County, Indiana, the Metropolitan School District of Washington Township, Marion County, Indiana, the Metropolitan School District of Wayne Township, Marion County, Indiana, School City of Beech Grove, Marion County, Indiana, School Town of Speedway, Marion County, Indiana, the Metropolitan Development Commission of Marion County, the Housing Authority of the City of Indianapolis, the Indiana State Board of Education, a public corporate body, Added Defendants,

Citizens for Quality Schools, Inc., Intervening Defendant,

Coalition for Integrated Education, Amicus Curiae.

The BOARD OF SCHOOL COMMISSIONERS OF the CITY OF INDIANAPOLIS, INDIANA, Cross-Claimants,

v.

The METROPOLITAN DEVELOPMENT COMMISSION OF MARION COUNTY, the Housing Authority of the City of Indianapolis, Cross-Defendants.

No. IP 68–C–225.

United States District Court, S. D. Indiana, Indianapolis Division.

July 11, 1978.

Lewis C. Bose, William M. Evans, Indianapolis, Ind., for Lawrence, Warren and Wayne Townships.

Richard L. Brown, Indianapolis, Ind., for Beech Grove.

Richard J. Darko, Indianapolis, Ind., for Indiana State Teachers Ass'n.

Charles W. Hunter, Indianapolis, Ind., for Decatur Township.

Harold E. Hutson, Indianapolis, Ind., for Citizens for Quality Schools, Inc.

H. William Irwin, Indianapolis, Ind., for Pike Township.

Alexander C. Ross, Samuel J. Flanagan, Civil Rights Div., Dept. of Justice, Washington, D. C., Virginia Dill McCarty, U. S. Atty., Indianapolis, Ind., for United States.

Donald A. Schabel, Indianapolis, Ind., for Perry Township.

William O. Schreckengast, Beech Grove, Ind., for Franklin Township.

Theodore L. Sendak, Atty. Gen., Donald P. Bogard, Deputy Atty. Gen., Indianapolis, Ind., for Governor Bowen, Sendak, Nagley and Indiana State Board of Education.

Sheila Suess, Indianapolis, Ind., for Housing Authority of City of Indianapolis.

Charles D. Kelso, John O. Moss, John Preston Ward, Indianapolis, Ind., for Buckleys.

William F. LeMond, Kurt F. Pantzer, Jr., Indianapolis, Ind., for Metropolitan Development Commission.

William E. Marsh, Indianapolis, Ind., for Coalition for Integrated Education.

Richard D. Wagner, Indianapolis, Ind., for Speedway.

Ben J. Weaver, Charles G. Reeder, Indianapolis, Ind., for Washington Township.

John Wood, James W. Beatty, Indianapolis, Ind., for Board of School Commissioners.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

This cause comes before the court pursuant to remand from the United States Court of Appeals for the Seventh Circuit, 573 F.2d 400 (1978).

To summarize briefly the more recent rulings in the case, the Court of Appeals held in 1976 that the action of the General Assembly of Indiana in passing legislation in 1969 to enlarge the City of Indianapolis to include all of Marion County, with the exception of three cities and towns, ("Uni-Gov"), while at the same time repealing a previous law providing that the boundaries of the civil city and the school city would, generally speaking, be coterminous, had an obvious racial segregative impact, and was a substantial cause of interdistrict segregation. *U. S. v. Bd. of Sch. Com'rs of City of Indianapolis*, 7th Cir., 541 F.2d 1211 at 1220. It also held that action of the added defendant Housing Authority of the City of Indianapolis ("HACI") in locating all of its public housing projects within IPS borders, although it had the authority to place them in the suburbs, produced discriminatory effects both within IPS and the suburbs. *Id.,*

p. 1223. The Court then found that this court's order, 419 F.Supp. 180 (1975), which ordered the transfer of black students from IPS to various suburban schools within Marion County, was in accord with the principles of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), and affirmed the same, 7th Cir., 541 F.2d 1211 (1976).

The Supreme Court of the United States vacated the judgment and remanded the case to the Court of Appeals for further consideration in light of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). On remand the Court of Appeals reaffirmed that the passage of Uni-Gov and its companion legislation meets the requirements of *Milliken* and therefore can be used as a basis for imposing an interdistrict remedy if the district court finds that the General Assembly, in enacting the series of legislation, acted with a racially discriminatory intent or purpose. 573 F.2d 400, 408. The purpose of the remand, therefore, is for this court to make findings as to the intent of the General Assembly, as well as to the intent of HACI and the Metropolitan Development Commission of Marion County ("Commission") with respect to the location of public housing.

In *Arlington Heights* the Court laid down some of the criteria to be considered in determining whether a racially discriminatory purpose entered into a challenged action. "The impact of the official action— whether it 'bears more heavily on one race than another,' *Washington v. Davis*, 426 U.S., at 242, 96 S.Ct., at 2049—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . ." 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450, 465.

The Court then went on to list other evidentiary considerations:

(1) "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes . .

(2) "The specific sequence of events leading up to the challenged decision . .

(3) "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.

(4) "Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

(5) "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. . ."
*Id.*, 429 U.S. p. 267, 97 S.Ct. p. 564, 50 L.Ed.2d pp. 465, 466.

The court will now consider the application of such criteria to the facts of this case.

### I. *Historical Background*

The situation of the Negro in Indiana, 1800–1971, was described in this court's first opinion in this case, 332 F.Supp. 655 (1971). The facts set out therein have never been challenged, and are a part of the law of this case. Such facts show that Negroes were held as slaves in Indiana, the provisions of its constitution to the contrary notwithstanding, that they had no right to vote, nor to serve in the militia, nor to intermarry with whites, nor to give testimony as a witness in a case involving a white party. The laws against serving in the militia and against intermarriage were not repealed until 1936 and 1965, respectively.

Further facts are that the Indiana Constitution of 1851 prohibited Negroes and mulattoes from coming into the state. Until after World War II, Negroes were rarely admitted, save on a segregated basis, to theatres, public parks, State parks, schools, or public hospitals. Housing was segregated in Indianapolis and Marion County until a date past the filing of this suit in 1968. Negroes were discouraged from purchasing homes in "white" neighborhoods by realtors who refused to show them such homes, by use of a "two-price" system, and by advertising housing for "colored" in Indianapolis newspapers. Racial covenants barring Negroes were made a part of various plats in suburban areas, and were enforced by the courts until 1948. An Indianapolis ordinance in 1926 made it a crime for a Negro to live in a white area, and vice versa. Pioneering Negroes who succeeded in penetrating a white neighborhood were harassed by threatening and obscene telephone calls and rocks hurled through windows. Custom and usage dictated that Negroes were not to stay overnight in small towns, and their departure was enforced by the police.

In the area of schools, Negroes, mulattoes and their children were barred from admission to the common schools by an act of 1861. In 1869, after the adoption of the Fourteenth Amendment, a law was adopted which provided for the education of Negro children, but only in segregated schools. The Supreme Court of Indiana held as recently as 1926 that Negro children were not entitled to admission in common schools provided for the education of white children, a policy legislatively recognized again in 1935. Desegregation, on a phased basis (one grade per year), was not required until 1949.

The added defendant suburban school corporations of Marion County, the record shows, have entered into a great number of interdistrict cooperative educational and vocational plans with each other and with districts outside the county. However, they have entered into none with IPS, although IPS has initiated such discussions. The only perceived difference between IPS and other districts (other than size) is race.

In 1868 Indianapolis erected a new school house and, anticipating the 1869 legislation, assigned the old building on Market Street for the education of Negro children. Thus the Indianapolis schools started educating the Negro child on a segregated basis and continue to do so until this day, inasmuch as

several all-black elementary schools remain in use.

From the foregoing, it will be noted that Indiana, unlike most states in the north and west, practiced *de jure* segregation by act of the General Assembly, just as was true in the southern and border states. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), therefore imposed upon Indiana and upon Indiana communities such as Indianapolis, which had practiced segregation in its schools, an instant duty to desegregate.

However, the law of this case is that successive School Boards of the City of Indianapolis after *Brown* continued policies of *de jure* segregation in the operation of IPS up until the time of this court's first decision in 1971, aided and abetted by officials of the State of Indiana. During the same period of time (1954–1971), the HACI, with the approval of the Commission, built numerous public housing projects in IPS territory, inhabited 98% by Negroes, but none in the territory of any of the suburban Marion County defendants, all of whom have consistently opposed such housing projects. The suburban defendants also unanimously opposed consolidation of all Marion County schools, as proposed pursuant to the Indiana School Reorganization Act of 1959, and they were successful.

As heretofore set out, the law of Indiana from the adoption of its Constitution of 1851 until 1959 was that the boundaries of a school city and of a civil city were coterminous. 332 F.Supp. 655, 675, n.86. In 1959 the Indiana School Reorganization Act, I.C. 1971, 20–4–1–1, et seq., provided that reorganized districts need not be coterminous, but in 1961 it was again provided by Acts 1961, ch. 186, § 1, I.C.1971, 20–3–14–1, et seq., that in counties having a city of the first class (Marion County), the extension of the boundaries of a civil city would automatically extend the school city boundaries, unless mutually agreed to the contrary. Thus for the period 1851–1969, except for the two year period 1959–1961, it was the law that any annexation of territory by the City of Indianapolis carried with it a like annexation of territory by IPS.

## II. *Sequence of Events Leading to Repeal of 1961 Act and the Enactment of Uni-Gov*

The added defendant Commission and its president participated in drafting Uni-Gov. It had done planning studies with respect to population growth in Marion County and as to where schools should be located. The Mayor of Indianapolis, a former member of the IPS School Board, appointed a task force for Uni-Gov called the Greater Indianapolis Progress Committee. All members of the General Assembly from the Marion County area were ex officio members of this committee. In short, Uni-Gov did not arise from some general impulse on the part of the entire General Assembly, but was envisioned, packaged and sold to the General Assembly by various Marion County and Indianapolis officials.

A public meeting was held November 27, 1968 and a draft was discussed. Such draft made no mention of schools, but opposition to the inclusion of schools was voiced at the meeting. Thereafter, a section was added to the draft providing that schools were excluded from the consolidation and expansion of the City of Indianapolis, and a separate bill was drafted, introduced, and passed by the General Assembly under an emergency clause, repealing that section of the 1961 Act which provided that the boundaries of the City of Indianapolis and IPS would be coterminous. Following all this, the Uni-Gov Act was passed.

The Mayor, when testifying as a witness, gave no educational or governmental reason for excluding the schools from the reach of Uni-Gov. He simply (and no doubt accurately) stated that the Uni-Gov bill would not have passed had the schools been included. The inference is that the representatives elected by the vote of suburban residents—many of whom had recently moved to the suburbs from the central city to escape the threat of desegregation posed by the filing of this very suit in 1968— would have voted against Uni-Gov but for exclusion of the schools.

### III. Departures from Normal—Legislative History

The evidence discloses no departure from normal procedural sequence, but the substantive departure is obvious. After 133 years of dehumanizing the Negro citizen through its laws, the General Assembly began in 1949 to attempt to right its previous wrongs. It enacted the school desegregation act in that year, and in subsequent years repealed the anti-miscegenation law, and other vestiges of past discrimination. In 1961 it enacted the law restoring the long established rule that the school city of Indianapolis should expand with the civil city.

Following the decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, in 1954 it became the duty of every member of the General Assembly, under his oath to support and defend the Constitution of the United States, to assist in desegregating the Indianapolis school system. The necessity of obtaining a wide dispersal of Negro school children in order to secure a stable plan was obvious in 1969, as a result of the dreary experience of resegregation in such places as Atlanta, Georgia, Washington, D.C., and elsewhere, which was widely known at that time. However, the General Assembly reversed its forward progress and departed from its long established boundary policy by repealing the crucial section of the 1961 Act, and eliminating the schools from Uni-Gov.

No further legislative history of Uni-Gov and companion legislation is available, since the Indiana General Assembly does not keep any record of its proceedings save the daily journal which records only motions and the results of roll calls.

### IV. Findings and Conclusions—Legislation

■ Considering all of the foregoing facts, it is perfectly obvious to this court, and it therefore finds, that the actions of the General Assembly above discussed were done, at least in part, with the racially discriminatory intent and purpose of confining black students in the IPS school system to the 1969 boundaries of that system, thereby perpetuating the segregated white schools in suburban Marion County.

It was virtually identical action on the part of the General Assembly of Delaware in passing the Education Advancement Act of 1968 which caused the district court in Delaware to order the consolidation of the 88% black public schools of Wilmington with white suburban schools of New Castle County. *Evans v. Buchanan*, D.C., 393 F.Supp. 428 (1975), aff'd, per curiam, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). In that case the General Assembly enacted a bill calling for the reorganization of Delaware schools, but provided that the boundaries of the Wilmington schools, which contained a huge majority of black students, could not be changed. The Delaware court concluded that the Act precluded the State Board of Education (charged with the duty of desegregating Wilmington) from considering the "integrative opportunities" of redistricting in New Castle County in any meaningful way, that when the Act was passed the State Board had not satisfied its obligation to eliminate the vestiges of *de jure* segregation in the Wilmington schools, and that therefore the Act constituted a suspect classification, with no compelling justification therefor, since it had a significant racial impact on the policies of the State Board. 393 F.Supp. 428 at 442, 443.

### V. The Housing Violations

Once again this court refers to the previous record in this case. It found as a fact in its 1973 opinion as follows: ". . . [T]here can be little doubt that the principal factor which has caused members of the Negro race to be confined to living in certain limited areas (commonly called ghettos) in the urban centers in the north, including Indianapolis, has been racial discrimination in housing which has prevented them from living any place else." 368 F.Supp. 1191, 1204. This finding was specifically approved by the Court of Appeals in its 1976 opinion. 541 F.2d 1211, 1222. Various aspects of racial discrimination in

housing by realtors licensed by the State, by state courts and legislative bodies, and by private citizens, have been set out in part I hereof.

■ Against this background of racial discrimination, can it be said to be a mere benign coincidence that HACI and the Commission located all public housing projects within IPS boundaries? This court thinks not and specifically holds that the action of such official bodies in locating such projects within IPS, as well as the opposition of the suburban governments to the location of public housing within their borders, were racially motivated with the invidious purpose to keep the blacks within pre-Uni-Gov Indianapolis and IPS, and to keep the territory of the added suburban defendants segregated for the use of whites only. The Court of Appeals has already agreed that the record shows a " 'purposeful, racially discriminatory use of state housing. . .' " 541 F.2d 1211, 1223.

The evidence clearly supports the foregoing findings. As the Court of Appeals for the Sixth Circuit has said:

"A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively established that their action or inaction was a consistent and resolute application of racially neutral policies." *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1046–47 (6th Cir., 1977) quoting *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182 (6th Cir., 1974.)

In this case it was obvious that the natural, probable and foreseeable result of erecting public housing projects wholly within IPS territory would be to concentrate poor blacks in such projects and thus to increase or perpetuate public school segregation within IPS. The Deputy Mayor of Indianapolis testified that HACI never even examined sites outside the then City of Indianapolis (IPS territory). No considera-

tion whatever was given to locating housing projects so as to reduce public school segregation, and then bring necessary municipal services to the project sites. When faced with the choice of locating a public housing project on the west side of Emerson Avenue (IPS territory) or across the street on the east side of such avenue (Warren Township territory), HACI chose the IPS side of the street. This deliberate choice was intended to, and did, perpetuate Warren Township as a segregated white community and IPS as a heavily black community.

The attitudes and motivation of the Metropolitan Development Commission have been the same. Its chief administrator testified that its demographic studies failed to take race into account in projections of population movement, or in considering the location of schools, and did not require housing developers in the suburbs to pledge a nondiscriminatory policy in either the sale or rental of property. This same Commission, after the filing of this suit, refused to permit the defendant School Board to relocate Crispus Attucks High School to a site at West 30th Street and Guion Road—a white neighborhood. The separation of the races, both in housing and in schools, has been an unspoken, but intentional policy of the Commission.

■ Certain of the added defendant suburban school corporations, joined by HACI, have attempted to avoid the foregoing facts, and the inferences naturally flowing therefrom, by arguing that HACI had no power to locate its housing projects outside the former City of Indianapolis (IPS territory), notwithstanding that the statute which enabled its creation, I.C. 18–7–11–1, et seq., provided from the date of its enactment in 1937 that the area of operation of a city includes the area of the city and the area within five miles of its territorial boundaries. I.C. 18–7–11–3(g)(1).

Added defendants refer to the United States Housing Act of 1937, and its requirement for cooperation agreements to be entered into by the public housing agency and the "governing body of the locality involved." 42 U.S.C. § 1415(7)(b)(i). They

then contend that since no such agreements were executed between HACI and the Marion County Council, the building of housing units in the suburban townships was impossible.

The foregoing argument, in the opinion of this court, is sheer nonsense. The section of the Indiana statute in question was analyzed by the Indiana Supreme Court in *Edwards v. Housing Authority of Muncie*, 215 Ind. 330, 19 N.E.2d 741 (1939). The holding was that:

"Normally the county government has jurisdiction outside of the area of incorporated cities and towns in respect to certain matters, but the city has power to annex additional territory, which, for governmental purposes within the scope of the authority of the city, is removed from the jurisdiction of the county. It may have been the legislative intention that either a county or a city housing authority might assume jurisdiction to act in respect to territory outside of the area of cities, but adjacent thereto, and no doubt the authority which first undertakes to exercise jurisdiction acquires exclusive jurisdiction.  .  .  ."

According to the evidence, HACI is the only housing authority ever established in Marion County to date, so there can be no question as to its power to have built its units in the unincorporated suburbs at any time. As to the section of Federal law quoted, "the locality involved" simply refers to the city, town, or county governmental unit which has established the housing authority—in this case the City of Indianapolis. Indianapolis did, of course, execute such a cooperation agreement. The statute has to do, *inter alia*, with the guarantee by the Federal Government of bonds issued by the local housing authority. Obviously, the cooperation desired is that of the governmental agency which chartered the housing authority—not that of some other unit (here the Marion County Council) which has no interest in the matter.

## VI.  *Application of Dayton v. Brinkman*

In *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), the Supreme Court vacated the judgment of the Court of Appeals for the Sixth Circuit, 539 F.2d 1084 (1976), which had approved a district court desegregation plan for the Dayton schools. The plan involved districtwide racial distribution under which the racial distribution of each school would be brought within 15% of the black-white population ratio of Dayton.

The trial court had found a three-part "cumulative" constitutional violation by the Dayton School Board—the lack of any affirmative effort to achieve racial balance in its schools, the former use of optional attendance zones, and its rescinding of resolutions passed by a previous Board which had acknowledged segregative practices and called for remedial measures. The Supreme Court criticized each of such findings for various reasons, and held that in any event there was no justification for imposing a systemwide remedy without evidence proving constitutional violations having a systemwide impact. It therefore remanded with directions to take additional evidence and, if constitutional violations be found, to determine how much incremental segregative effect such violations had on the racial distribution of the Dayton school population as presently constituted, as compared to what it would have been in the absence of such constitutional violations.

Following *Dayton*, the Court of Appeals has directed this court to make the same determinations. The record shows that as of April 30, 1974, HACI owned 2,395 apartment units of various sizes, other than those held for rent exclusively to the elderly (R.1975, pp. 164–173 incl.). Estimating three school age children per unit, it is apparent that more than 7,000 pupils would have been afforded a desegregated education in the schools of added defendants had the housing units been placed outside IPS. Further, the evidence is that the neighborhoods around housing projects tend to become integrated, so that others would have moved to the suburban housing areas. The total would approximate the number of students which this court proposes to transfer.

## VII.  *The Legislative Remedy*

█  As set out in this court's entry for June 2, 1978, the General Assembly of Indi-

ana has enacted a statute, I.C.1971, 20–8.1–6.5–1, et seq., pursuant to which a court may order transfers of students from one school corporation to another as an aid to desegregation. The Act requires three findings to be made in order to justify the transfers:

(1) A transferor corporation must have violated the equal protection clause of the fourteenth amendment to the Constitution of the United States by practicing de jure racial segregation of the students within its borders;

(2) A unitary school system within the meaning of such amendment cannot be implemented within the boundaries of the transferor school corporation; and

(3) The fourteenth amendment compels the court to order a transferor corporation to transfer its students for education to one or more transferee corporations to effect a plan of desegregation in the transferor corporation which is acceptable within the meaning of such amendment.

The foregoing constitute all of the requirements for transfer (save exhaustion of appeals). There is no requirement whatever for *Arlington Heights* or *Washington v. Davis* analysis of the transferee corporation, nor that it have been guilty of any fourteenth amendment violation. The statute represents purely and simple a State enacted remedial measure, which the General Assembly had undoubted power to enact.

In its opinion of August 1, 1975 this court made the three required findings as the basis for its order to IPS to transfer, and to the suburban school corporations to receive certain numbers of black school children. Since such findings were not found unsupported by the evidence on appeal, they would seem to constitute the law of the case.

To eliminate any doubt, however, this court now states its findings anew, as follows:

(a) The defendant Board of School Commissioners of Indianapolis, Indiana (IPS) has violated the equal protection clause of the Fourteenth Amendment to the Constitution of the United States by practicing de jure racial segregation of the students within its borders. *United States v. Board of Sch. Com'rs, Indianapolis, Ind.,* 332 F.Supp. 655 (S.D.Ind.1971), aff'd 474 F.2d 81 (7 Cir. 1973), cert. den. 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973).

(b) A unitary school system within the meaning of such amendment cannot be implemented within the boundaries of IPS. "In the long haul, it won't work." 332 F.Supp. 655, 678.

(c) The Fourteenth Amendment compels the court to order IPS to transfer a substantial number of its black students to various added defendant school corporations for education in order to effect a plan of desegregation in the transferor corporation which is acceptable within the meaning of such amendment.

The general transfer law of Indiana is quite liberal. It provides that a transfer may be made upon application by the parent of any child who resides in the transferor corporation "if it feels the child may be better accommodated in the public schools of another school corporation of this state or of an adjoining state . . . ." I.C. 1971, 20–8.1–6.1, et seq. Inasmuch as transfers have long been a part of the Indiana educational system, it is only natural that such a method was selected by the General Assembly as one method of assisting in bringing about desegregation in systems such as IPS. The use of such statute does not require the courts to consider *Dayton*-type rules, but only what is necessary to desegregate the transferor corporation.

VIII. *Conclusions of Law*

Pursuant to the findings of fact herein it is concluded as a matter of law that this court's previous order and judgment of August 1, 1975 should in all things be reinstated, with that part thereof pertaining to the transfer of pupils revised so as to apply to the school year 1978–79. Surplus IPS teachers should be hired, if required, by the transferee school corporation.

The court further concludes, based on its previous finding that the State has an af-

firmative duty to assist in desegregating IPS, that the defendant Superintendent of Public Instruction should forthwith develop a comprehensive in-service training program as described in *Bradley v. Milliken,* 402 F.Supp. 1096, 1139 (E.D.Mich.1975), aff'd 540 F.2d 229 (6 Cir. 1976), aff'd *sub nom. Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). Such program shall be participated in by all teachers and staff of the transferee schools prior to and during the coming 1978–79 school year. Any and all expenses of developing and administering such program shall be paid by the State of Indiana.

The court further concludes that the limitations on the construction or renovation of public housing projects by HACI should be expanded to include any type of low-rent housing, as that term is defined and used in 42 U.S.C., Chapter 8, §§ 1401, et seq.

Orders will be entered in accordance herewith.