677 F.2d 1185
 4 Ed. Law Rep. 447
 UNITED STATES of America, Plaintiff-Appellee,
Donnie Brurell Buckley and Alycia Marquese Buckley, etc.,
Intervening Plaintiffs-Appellees,
v.
The BOARD OF SCHOOL COMMISSIONERS OF the CITY OF
INDIANAPOLIS, et al., Defendants-Appellees,
Robert D. Orr, as Governor of the State of Indiana, et al.,
Added Defendants-Appellants.
 No. 81-2209.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 21, 1982.
Decided March 26, 1982.
 
 Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and POSNER, Circuit Judge.
 SWYGERT, Senior Circuit Judge.
 
 
 1
 This court has previously addressed both liability and remedial issues in the Indianapolis school desegregation case. We shall not repeat the history of the litigation. See 637 F.2d 1101 (7th Cir. 1980). The only issue here is who shall pay the cost of the desegregation plan ordered by the district court for interdistrict violations in Marion County, Indiana.
 
 
 2
 The following statements constitute the law of this case and underlie our decision.[1] Only the State of Indiana was found liable for the interdistrict violations. 456 F.Supp. 183, 188. The basis for its liability included the enactment of Uni-Gov legislation. Ibid. Neither the Board of School Commissioners of the City of Indianapolis, Indiana (hereinafter "IPS") nor the suburban school districts were found liable for the interdistrict violations. 506 F.Supp. 657, 666-68. The district court established a desegregation plan to remedy the interdistrict violations. It ordered black students from IPS to be transferred to designated suburban districts; it also ordered the state to design, implement, and pay the costs of in-service training and other ancillary relief. 506 F.Supp. at 671-74. We have affirmed these findings and orders. 637 F.2d 1101 (7th Cir. 1980). The Supreme Court has denied all petitions for certiorari. 449 U.S. 838, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980).
 
 
 3
 On June 19, 1981 four suburban school districts filed with the district court a petition that sought a ruling on who was financially responsible for the cost of the desegregation plan. The school year was to begin soon, the Indiana General Assembly had met and adjourned without appropriating funds for the desegregation plan, and the petitioners were understandably concerned about where the funds for the plan would come from. Allocating the costs of a desegregation plan is, of course, part of the remedial power of the district court. See Milliken v. Bradley, 433 U.S. 267, 289-90, 97 S.Ct. 2749, 2761-62, 53 L.Ed.2d 745 (1977). The district court held that the State of Indiana should pay the entire cost of remedying the interdistrict violations because it alone had been found liable for them. Memorandum of Decision, July 17, 1981, at 3.
 
 
 4
 The district court also held that the State of Indiana must pay the receiving school corporation the transfer tuition for any IPA student sent to it. The state may then deduct the transfer tuition from state distributions otherwise payable to IPS. The state must pay all transportation costs, including the cost of transportation in extracurricular activities. The state must reimburse IPS for increased costs attributable to the loss of enrollment and reduction in staff resulting from the court's remedial orders. Finally, the state must initially make these payments from unappropriated funds, and state officials may not discriminatorily reduce state distributions to the school corporations affected by the court's order.
 
 
 5
 The state alleges various grounds for reversal. For the reasons stated below, we affirm the district court's order.
 
 
 6
 * In 1974 the Indiana General Assembly enacted Indiana Code § 20-8.1-6.5-1 et seq. (hereinafter the "Transfer Statute"). It provides that the State of Indiana will pay one-half of the cost of transportation ordered by a court (while the local school districts involved will bear the balance) if the following three conditions are met:
 
 
 7
 A. A transferor corporation has violated the equal protection clause of the Fourteenth Amendment to the Constitution of the United States by practicing de jure racial segregation of the students within its border,
 
 
 8
 B. A unitary school system within the meaning of such Amendment cannot be implemented within the boundaries of the transferor corporation, and
 
 
 9
 C. The Fourteenth Amendment compels the Court to order a transferor corporation to transfer its students for education to one or more transferee corporations to effect a plan of desegregation in the transferor corporation which is acceptable within the meaning of such amendment.
 
 
 10
 Ind. Code § 20-8.1-6.5-1. The state contends that the district court erred in not following the terms of this statute. It argues that the transfer statute applies to this case, that the three conditions are met, and so the financial liability of the state should be limited to fifty percent of the costs.
 
 
 11
 * The state asserts that the applicability of the transfer statute is the law of the case because the district court has held previously that the three conditions for the applicability of the statute have been satisfied. This contention is erroneous. In an earlier ruling the district court did interpret the transfer statute as a substantive basis for liability. We reversed, holding that the statute is procedural only. 637 F.2d at 1112. Neither court has previously decided whether the transfer statute has any applicability at the remedial stage.
 
 B
 
 12
 We hold that the transfer statute has no applicability here.[2] The statute by its own terms applies only to instances of constitutional violations by the transferor corporation (here, IPS). This appeal, however, involves a remedy for interdistrict violations for which the State of Indiana, not IPS, is responsible. 637 F.2d at 1108. The statute does not address the situation where the State of Indiana is the wrongdoer.
 
 
 13
 In addition, the situation that triggers the transfer statute is now a legal impossibility. In Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), the Supreme Court held, in effect, that a unitary school system can always be established within the geographical boundaries of the school district that committed the de jure segregation. 418 U.S. at 745-46, 94 S.Ct. at 3127-28. The Court held that district courts cannot remedy de jure segregation confined to one school system by transferring students outside that system. Ibid. The transfer act was passed prior to Milliken I and makes sense only in light of pre-Milliken I jurisprudence.
 
 
 14
 For both of these reasons, therefore, the transfer statute is inapplicable.
 
 C
 
 15
 Even if the transfer statute applied, the district court would not be bound by its terms. The state notes that the Tenth Amendment as well as basic principles of federalism gives it inherent authority to structure its finances. The transfer statute, it argues, is a financing statute that was duly enacted by the Indiana General Assembly, and so must be followed.
 
 
 16
 We reject this argument. The State of Indiana, and only the State of Indiana, has been found liable for the interdistrict violations. The cost of remedying these violations is the issue before this court. The state is asserting that, despite the fact that it alone has been adjudicated the wrongdoer, it can limit the power of a federal court acting in equity to remedy violations of the federal Constitution. This is not the law. In Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ), the Chief Justice, writing for the Court, stated:
 
 
 17
 The Tenth Amendment's reservation of non-delegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment. Cf. Fitzpatrick v. Bitzer, 427 U.S. 445 (96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Nor are the principles of federalism abrogated by the decree.
 
 
 18
 433 U.S. at 291, 97 S.Ct. at 2763. As Justice Powell also observed:
 
 
 19
 Ordinarily a federal court's order that a State pay unappropriated funds to a locality would raise the gravest constitutional issues.... But here, in a finding no longer subject to review, the State has been adjudged a participant in the constitutional violations, and the State therefore may be ordered to participate prospectively in a remedy otherwise appropriate.
 
 
 20
 433 U.S. at 295, 97 S.Ct. at 2764 (Powell, J., concurring) (citations omitted).
 
 
 21
 The state's reliance upon Evans v. Buchanan, 582 F.2d 750 (3d Cir. 1978), is inapposite. In Evans the court of appeals reversed the district court's action of setting a local property tax rate at a level different from that imposed by the state legislature. It held that the district court gave insufficient deference to the broad authority of a state to establish levels of taxation. Our situation is quite different. The district court has not attempted to restructure state or local taxation. It has neither established tax rates nor mandated a particular method of determining tax rates. The district court has only forbidden the state from shirking its responsibility for the costs of remedying its wrongdoing.
 
 II
 
 22
 As an alternative ground the state argues that the district court abused its discretion by requiring the state to pay the entire cost of the desegregation plan. The state admits that in equity cases, and especially in school desegregation cases, the trial court has broad discretion in fashioning remedies. It contends, however, that the school districts in Marion County are also liable for the constitutional violations and so should share the cost of remedying them. We disagree.
 
 
 23
 The issue here is who shall pay for the desegregation plan ordered by the district court for interdistrict violations.[3] Only the State of Indiana was found liable for these violations. 637 F.2d at 1108. IPS and the other school districts in Marion County were found not liable for them. 637 F.2d at 1112. Given these findings, we do not see how the district court could have ruled any other way on the issue of financial liability.[4] It is a basic equitable principle that the wrongdoer is liable for the cost of rectifying his wrongful conduct. The fact that a court's equitable remedies implicate state funds is no bar to the court's exercise of its equitable powers. Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); Milliken v. Bradley, 433 U.S. 267, 289, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977); New York State Assoc. for Retarded Children, Inc. v. Carey, 596 F.2d 27, 39 (2d Cir.), cert. denied, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979). The state alone is liable for the interdistrict violations that gave rise to the desegregation plan the cost of which is at issue on this appeal. The wrongdoer cannot evade the cost of remedying its wrongdoing.
 
 
 24
 The state's reliance upon Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II); Liddell v. Board of Educ. of City of St. Louis, 667 F.2d 643 (8th Cir. 1981); Reed v. Rhodes, 500 F.Supp. 404, 425-26 (N.D.Ohio 1980), aff'd, 662 F.2d 1219 (6th Cir. 1981); and Penick v. Columbus Board of Education, 519 F.Supp. 925, 942 (S.D.Ohio 1981), aff'd, 663 F.2d 24 (6th Cir. 1981), is misplaced. First, all these cases involved intradistrict violations. Second, in all these cases the local school districts, as well as the states, were found to be wrongdoers. In those cases, therefore, it was equitable to divide the financial burden between the state and the local school districts. Here only the state was found liable for interdistrict violations. The district court did not abuse its discretion.
 
 III
 
 25
 The state also contends that the district court erred in allocating two specific costs to the state: (1) the cost of reimbursing IPS for its financial losses caused by the student transfers; and (2) the cost of the extracurricular transportation for the transferred students. The district court has broad discretion in fashioning equitable remedies for Fourteenth Amendment violations. Our standard of review is whether the district court abused its discretion.
 
 
 26
 The district court found that IPS will suffer losses because of the one-way transfer of students. The state made no showing that this factual finding was clearly erroneous. The state contends that the formula used to compute IPS's losses is arbitrary. Nonetheless, there is ample support in the record for the validity of the formula. We find no abuse of discretion.
 
 
 27
 Desegregating extracurricular programs is necessary when desegregating school districts. See Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968). The state admitted at oral argument that for many of the transferred students the distance from the suburban schools to their homes is very great. Participation by these students in after-school programs would be extremely difficult without transportation. Moreover, only black students are being transferred; not providing them with extracurricular transportation would place an added burden on innocent black children.
 
 
 28
 The fact that the Indiana General Assembly has not chosen to finance extracurricular transportation for any school district is irrelevant. We previously rejected this argument in a similar context. In an earlier order the district court held that certain ancillary, in-service programs were necessary to ensure effective implementation of its interdistrict remedy, and it directed the state to pay the costs that were not paid by federal funds. 506 F.Supp. at 674. On the authority of Milliken II, we rejected the state's argument that the court could not order the state to implement these programs because the general assembly had not appropriated money for these types of programs in any school district. 637 F.2d at 1116. Parallel reasoning supports the district court's order here. The court found extracurricular transportation necessary for effective implementation of its plan; that finding justifies requiring the state to pay the cost.
 
 
 29
 The state has not challenged the educational value of the extracurricular activities. It has not challenged the necessity of extracurricular transportation to prevent the exclusion of black IPS students from after-school activities. The state has failed to demonstrate that the district court abused its discretion.
 
 IV
 
 30
 Finally, the state challenges paragraph 6 of the plan. The paragraph states:
 
 
 31
 Source of Funds. All payments required to be made by the State under the provisions of this Plan shall first be paid from funds not appropriated for any other purpose. In particular, payments made by the State under this Plan shall not, except where otherwise provided herein, reduce in any manner payments or distributions from State funds to which any of the school corporations which are parties to this Plan are, or would be, entitled under applicable law if no students had been transferred for educational purposes, nor shall any payments hereunder reduce distributions to which any other school corporation in the State of Indiana is entitled under applicable law.
 
 
 32
 The state argues that this provision is an improper invasion of its sovereignty. We disagree.
 
 
 33
 When the district court entered its order the Indiana General Assembly had already adjourned after enacting appropriations for fiscal year 1981. The Indiana Constitution permits state officials to expend money only in accordance with appropriation. Indiana Constitution, Art. 10 § 3. Paragraph 6 was necessary, therefore, to ensure that the affected school districts would not have to use their regular allotments to pay the cost of the desegregation plan during the period before the general assembly resolved the financing issue. Absent this provision of the order, state officials would lack funds to make the payments required by the plan.
 
 
 34
 Moreover, the provision does not prevent the Indiana General Assembly in the future from allocating funds in any way it chooses so long as it appropriates sufficient funds for the desegregation plan. Paragraph 6 only prevents the General Assembly from carving out the funds for the desegregation plan from a school district's regular appropriations. To force IPS and the suburban school districts to finance the plan out of their regular appropriations would reduce the amount of money that they would have for educational purposes below the level that all other school districts in the state would have. See Ind. Code §§ 21-3-1.6-1 et seq. and §§ 21-3-3.1-1 et seq. The court's provision forbids the General Assembly from discriminating in this way against the students in the school districts subject to the court's desegregation order. Innocent black children in IPS have suffered enough. This court cannot countenance their being further victimized by requiring them to pay the cost of remedying their own injuries. The district court did not abuse its discretion. See, Griffin v. County School Board, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964).
 
 
 35
 The General Assembly retains its authority over school financing subject only to the requirement that it adequately support the desegregation plan. The court's order does not limit the power of the General Assembly to reallocate state funds for all functions of state government, including the general support of local public schools, in light of the court-ordered obligations. The General Assembly may reduce appropriations to public schools generally, reallocate appropriations for other governmental functions, or raise taxes. It is not the province of a federal court to instruct the legislature on how it should finance its obligations. The district court did not attempt to do so. The court did what was within its authority-order a wrongdoer to pay the cost of remedying its wrongdoing.
 
 
 36
 The district court's order is affirmed.
 
 
 37
 POSNER, Circuit Judge, dissenting.
 
 
 38
 The district court's order which this court affirms places on the State of Indiana the entire cost of court-ordered busing of black schoolchildren from schools of the Indianapolis Public School District (IPS) to schools in suburban Marion County. In addition, the order forbids the state to defray any part of that cost out of its appropriations for education; at least that is the only meaning I can assign to paragraph 6 of the district judge's plan, which this court does not purport to modify.
 
 
 39
 With all due regard for the forcefully articulated contrary view of my brethren, I am not persuaded that the order below is an appropriate exercise of the federal equity power. As a judgment of this sort is inescapably particularistic, I shall not attempt to review the decisions in other circuits dealing with the financing of busing decrees; none appears to involve facts similar to those of the present case.
 
 
 40
 This lawsuit, begun in 1968, initially charged just IPS with maintaining a system of segregated public schools, in violation of the Fourteenth Amendment. In 1969 the Indiana legislature, by the legislation known as "Uni-Gov," extended the boundaries of Indianapolis to be coterminous with those of Marion County, except that the boundaries of the Indianapolis public school system were not extended. As a result of the movement of whites from the old city limits of Indianapolis to the Marion County suburbs that were now part of the city, by the time the district judge was ready to issue a remedial decree in this litigation the public schools of IPS were so predominantly black that he thought a decree limited to those schools would simply drive the remaining whites out of IPS. He therefore included in the decree a provision directing the busing of black schoolchildren from IPS to suburban Marion County schools. He also invited the Indiana legislature to enact legislation to fund the decree. The legislature responded by passing the "Transfer Statute," Ind. Code §§ 20-8.1-6.5-1 et seq., in 1974. This statute provides that if a public school district is found to have violated the Fourteenth Amendment and is ordered to bus students outside it, the costs of busing are to be divided between the district and the state. Although IPS was not named in the statute, it was the "transferor corporation" that the draftsmen had in mind.
 
 
 41
 At about the same time, Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ) was decided. It held that busing outside a local school district's boundaries was not a proper remedy for a violation committed by the district alone unless the violation had caused racial segregation between districts; if not, an interdistrict busing order was proper only if the state or some other entity had committed its own constitutional violation that had caused interdistrict segregation. As a result of Milliken I, the order in this litigation directing the busing of black schoolchildren from IPS to the suburban schools had to be remanded for a determination whether the State of Indiana or some state agency was guilty of segregation or, if not, whether IPS itself had caused the interdistrict segregation. On remand the district court found that neither IPS nor the suburban school districts had caused it but that the State of Indiana and one of its agencies, the Housing Authority of Central Indiana (HACI), had, and thus interdistrict busing was a proper remedy. HACI had refused to place public housing, which would have been occupied largely by blacks, anywhere in Marion County beyond the boundaries of IPS; this had contributed to keeping the suburbs of Marion County white. And through the schools exception to Uni-Gov the State of Indiana had prevented IPS from expanding to take in the white suburban schools, which would have allowed busing throughout Marion County to be ordered consistently with Milliken I because the entire county would have been a single school district.
 
 
 42
 Since the State of Indiana has been found liable for intentional segregation of the public schools, the district court's interdistrict busing order is valid. With that determination, affirmed by this court in 1980 in United States v. Board of School Comm'rs, 637 F.2d 1101, 1116 (7th Cir. 1980), this litigation should have ended. But last summer, with the busing order scheduled to take effect in the fall, several of the Marion County suburban school districts petitioned the district court for an order assigning the costs of the busing (not just transportation costs, but, more important, the costs of educating the bused students) to the state. The state had planned to allocate those costs in accordance with the Transfer Statute. It is not entirely clear why the suburban school districts were dissatisfied with this method of allocation; and perhaps their petition should have been dismissed for failure to demonstrate irreparable injury. But apparently they were afraid that the state would refuse to appropriate any extra money for busing, with the result that any costs not picked up by IPS might have to be paid out of the education budgets of the transferee corporations, i.e., the suburban school districts. I am not at all clear how this might come about, since the principal cost entailed by the busing order is the cost of educating the bused children and the Transfer Statute puts this cost on IPS rather than the state. But I shall pass this point and assume that the suburban school districts have a reasonable basis for concern that the Transfer Statute, if applied, would place significant costs on them.
 
 
 43
 The issue in this appeal is not the validity or enforcement of the busing order-all of the parties affirm that the order is being and will continue to be complied with-but only the allocation of the costs of compliance; and I submit that how the State of Indiana chooses to pay for busing is, at least in the first instance, the business of the State of Indiana rather than the federal courts. Cf. Evans v. Buchanan, 582 F.2d 750, 778-80 (3d Cir. 1978). It would become our business only if the state decided to make the black people against whom the defendants in this litigation have been found guilty of discriminating defray the costs of the injunction in their favor, or if the state otherwise sought to thwart the busing order. I agree that "Innocent black children in IPS have suffered enough," as my brethren put it. But it is premature to conclude that the Transfer Statute would make them suffer more. We do not know what measures IPS would take to pay for its share of the costs of busing-what tax or other resources for financing are available to it-or how the suburban school districts would pay for their share, whatever it may be. We do not even know whether the Indiana courts would hold the Transfer Statute applicable.
 
 
 44
 My contention that the financing issue ought to be left to the state to resolve derives from the nature of our federal system, which implies that interventions by federal courts into the processes of state government ought to be minimized, but more simply from traditional notions of equity jurisprudence. The end of an equity suit is an injunction, or if the injunction is not obeyed a contempt proceeding; it is not an inquiry into who will bear the costs of the injunction. Suppose a company was found to have violated Title VII of the Civil Rights Act of 1964 by paying its black workers less than its white workers, and an injunction forbidding the discrimination was entered. No one would ask where the company was going to get the money to pay higher wages to its black workers (presumably the market would not let it just lower the whites' wages to the blacks' level)-whether it was going to raise prices and reduce output, or use more labor-saving machinery and reduce its work force, or reduce dividends, or what have you. These are fascinating questions for economists, but too difficult and tangential to engage the attention of courts, as the Supreme Court has held in dealing with comparable issues of "incidence" in the antitrust field. See Illinois Brick Co. v. Illinois, 431 U.S. 720, 732, 741-422, 97 S.Ct. 2061, 2067, 2072, 52 L.Ed.2d 707 (1977). Only if the company attempted to comply with the injunction by committing a fresh act of discrimination, as by firing its black workers, would the question of how the costs of the injunction were being defrayed come before the court that had issued the injunction. I do not see why the result should be different in this case. A defendant that happens to be a state of the United States is entitled to as much consideration as a private corporation.
 
 
 45
 So the district court should in my view have dismissed the petition asking it to devise its own scheme for allocating the costs of the busing order. If the petitioners want to challenge the application of the Transfer Statute let them do so in state court. The courts of Indiana may hold the statute inapplicable. It is premature for the federal courts to get involved in the matter.
 
 
 46
 But if I am wrong and the proper thing to do in this case was to apportion the costs of the busing order among the various wrongdoers, the district court should have used greater realism in making the apportionment. In placing on the State of Indiana the full costs of rectifying the interdistrict violation (to simplify discussion I shall ignore the role of HACI, as did the district court in its apportionment plan), the court treated the state as if it were an individual that had promulgated Uni-Gov, with its schools exception, in the manner in which Louis XIV ("L'Etat, c'est moi") ordered the construction of the Palace of Versailles. The "state" was responsible; "it" should pay; the other "guys"-IPS and the suburban school districts of Marion County-were blameless and should suffer no diminution in their educational appropriations as a result of the state's misconduct.
 
 
 47
 All this is a vast oversimplification. I put to one side the fact that there never would have been an Indianapolis school litigation or an interdistrict busing order had it not been for the violations of the Fourteenth Amendment that IPS was committing as late as 1971; for it was against IPS and IPS alone that this suit was originally brought. I am thus willing to indulge the heroic assumption that IPS is without any legal or moral responsibility for the busing order. Therefore, if contrary to my view it really is our business to decide how the costs of complying with the busing order should be apportioned, then I agree that we should reject the approach in the Transfer Statute-even though that statute was passed at the behest of the district judge presiding over this litigation-because it assumes that IPS is the chief wrongdoer. But what we cannot ignore, if we are to do equity, is the role of the Marion County suburbs in the principal act of interdistrict discrimination found in this litigation-the exclusion of the suburban public schools from Uni-Gov.
 
 
 48
 I know that the suburban school districts were absolved from any share of legal liability for the segregation of the Marion County schools. Not only have I no desire to reopen the liability question, but as an original matter I would consider it highly unlikely that a school district could cause, and so in a legal sense be liable for, segregation between districts, as distinct from segregation within a district. To cause segregation between districts you have to be able to keep black people from moving into a district, which is something beyond the power of a school board.
 
 
 49
 But the issue before us is not liability. The suburban school districts are asking for extraordinary equitable relief. To see how extraordinary, consider the following variation of my earlier hypothetical case of a company found to have violated Title VII. Suppose there had been two defendants originally, the company and the union representing its employees, but the union was absolved from liability. And suppose that after the company had been found liable and ordered to desist from further discrimination, it had raised the wages of its black workers, and since its total wage bill was now higher had reduced its work force, thereby laying off some members of the union. If the union came into court asking for a decree forbidding the company to pass on to its workers, in the form of job lay-offs, any part of the costs of complying with the antidiscrimination decree, it would not be heard to argue that the court's judgment absolving it from liability compelled the court to grant it the extraordinary remedy that it was seeking. A further inquiry would be necessary. Similarly, in this case we should consider whether the suburban school districts are in good conscience entitled to the extraordinary equitable relief that they are seeking.
 
 
 50
 In so considering, we should recognize that the actions of school boards are only one manifestation of the desires of the people of suburban Marion County; the votes of their representatives in the Indiana legislature are another relevant manifestation. Now no one, I take it, thinks that the reason why IPS's boundaries were not expanded to embrace the whole of Marion County was that the voters of South Bend or Fort Wayne or Evansville, who will share the cost of the busing decree under the order affirmed today, wanted the public schools of suburban Marion County to remain white. The schools exception to Uni-Gov was procured by the legislators elected by the people of suburban Marion County. This is not only obvious but was found as a fact by the district court in this litigation. The "Mayor (of Indianapolis), testifying as a witness, gave no educational or governmental reason for excluding the (suburban) schools from the reach of Uni-Gov. He simply (and no doubt accurately) stated that the Uni-Gov bill would not have passed had the schools been included. The inference is that the representatives elected by the vote of suburban residents-many of whom had recently moved to the suburbs from the central city to escape the threat of desegregation posed by the filing of this very suit in 1968-would have voted against Uni-Gov but for exclusion of the schools." United States v. Board of School Comm'rs, 456 F.Supp. 183, 187 (S.D.Ind.1978).
 
 
 51
 Thus, so far as segregation between school districts is concerned, which is all that is before us in this appeal, it is the residents of the white suburbs of Marion County who are the primary wrongdoers, as a matter of equity if not of law, for there would be no need for an interdistrict busing order without the schools exception in Uni-Gov and there would be no schools exception but for the actions of the white voters of suburban Marion County. As the district court stated in another of its opinions in this litigation, "the suburban Marion County units of government ... have consistently resisted the movement of black citizens or black pupils into their territory. They have resisted school consolidation, they resisted civil annexation so long as civil annexation carried school annexation with it, they ceased resisting civil annexation only when the Uni-Gov Act made it clear that the schools would not be involved. Suburban Marion County has resisted the erection of public housing projects outside IPS territory, suburban Marion County officials have refused to cooperate with HUD on the location of such projects, and the customs and usages of both the officials and inhabitants of such areas has been to discourage blacks from seeking to purchase or rent homes therein ...." United States v. Board of School Comm'rs, 419 F.Supp. 180, 182-83 (S.D.Ind.1975). In light of this history, for the suburban school districts, which are apparently among the richest in the state, to urge that the costs of the busing order should be borne by the people throughout the state who are dependent on the noneducational appropriations in the state budget and that the educational budgets of Marion County should be sacrosanct is to invoke the spirit not of equity but of effrontery.
 
 
 52
 But as I said before, rather than get into the tangled and recriminatory business of who shall pay for this court-ordered busing, we should say: "This litigation ended, at long last, when the district court's busing order was upheld by this court and certiorari was denied. Let the State of Indiana worry about who shall bear the costs of complying with the order. It is not a matter for the federal courts unless the state should devise a method of financing that discriminates against the black people who are the intended beneficiaries of the order. Other than in a purely technical sense there is no federal question before us today."
 
 
 53
 Such a disposition of this case would not be contrary to Milliken II, which holds that a federal court does not violate the Tenth or Eleventh Amendments when it decides how the costs of a busing decree shall be borne. Milliken v. Bradley, 433 U.S. 267, 288-91, 97 S.Ct. 2749, 2761-62, 53 L.Ed.2d 745 (1977). It does not follow that because a federal court has the power to tell a state how to finance a busing decree it should exercise that power in a particular case or in a particular way. I would reverse.
 
 
 
 [1]
 The issue of who shall pay the cost of remedying intradistrict violations within IPS is not before this court. That issue, of course, would present a different posture
 
 
 [2]
 Because the State of Indiana has argued that the transfer statute is the only available means for implementing the federal court order, we are required to interpret the statute to determine whether it applies to these facts
 
 
 [3]
 As noted previously, the issue of remedying intradistrict violations in IPS is not before the court in this appeal
 
 
 [4]
 We cannot allow relitigation of the issue of liability through discussion of remedies